PROTESTANTS AND OTHER AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE ET AL., APPELLANTS, *v.* ESSEX ET AL., APPELLEES.

[Cite as P. O. A. U. v. Essex (1971), 28 Ohio St. 2d 79.]

(No. 70-583—Decided November 24, 1971.)

*Mr. Philip R. Bradley, Mr. Willard Dobbs* and *Mr. Franklin C. Salisbury*, for appellants.

*Mr. William J. Brown*, attorney general, *Messrs. Dunbar, Kienzle & Murphey* and *Mr. David J. Young*, for appellees.

HERBERT, J. This case presents the question of whether R. C. 3317.06(H), as effective between December 1, 1967, and August 18, 1969, is a "law respecting the establishment of religion or prohibiting the free exercise thereof, and so in conflict with the First and Fourteenth Amendments to the [United States] Constitution." *Board of Edn.* v. *Allen* (1968), 392 U. S. 236, 238, 20 L. Ed. 2d 1060, 88 S. Ct. 1923. Further, we are called upon to decide whether that statute grants "* * * any exclusive right to, or control of, any part of the school funds of this state," to a religious or other sect as is proscribed by Section 2 of Article VI of the Constitution of Ohio.

At the time this action was initiated, R. C. 3317.06(H) provided:

"In addition to the monies paid to eligible school districts pursuant to Section 3317.02 of the Revised Code, there shall be distributed monthly, quarterly, or annually as may be determined by the State Board of Education, monies appropriated for Chapter 3317 of the Revised Code for the following education programs:

"* * *

"(H) An amount to each school district as approved by the State Department of Education, to provide services and materials to pupils attending non-public schools within the school district for: guidance, testing and counseling programs; programs for the deaf, blind, emotionally disturbed, crippled and physically handicapped children; audio visual aids; speech and hearing services; remedial reading programs; educational television services; programs for

the improvement of the educational and cultural status of disadvantaged pupils, approved pursuant to division (F) of Section 3317.06 of the Revised Code; and for programs of non-religious instruction other than basic classroom instruction. Such services, materials or programs shall be provided for pupils attending non-public schools on the same basis as such services, materials and programs are provided for pupils in the public schools of the district.

"No later than December 1, 1967, the State Department of Education shall adopt guidelines and procedures under which such programs and services shall be provided.

"No funds shall be distributed pursuant to this division prior to January 1, 1968, and total funds distributed pursuant to this division shall not exceed specific appropriations therefor."

*Board of Edn.* v. *Allen, supra* (392 U. S. 236), and *Walz* v. *Tax Comm.* (1970), 397 U. S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409, are cases decided by the United States Supreme Court which are in point upon the federal constitutional question.

In *Allen,* the constitutional validity of a law of the state of New York was challenged. There, local public school authorities were required to lend textbooks free of charge to all students in grades seven through twelve, including students attending private schools. In *Allen,* the court upheld the statute and applied a test for distinguishing between forbidden and permitted involvements of the state with religion. In so doing, the court reviewed *Zorach* v. *Clauson* (1952), 343 U. S. 306, 96 L. Ed. 954, 72 S. Ct. 679; *McGowan* v. *Maryland* (1961), 366 U. S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101; *Everson* v. *Board of Edn.* (1947), 330 U. S. 1, 91 L. Ed. 711, 67 S. Ct. 504; and *Abington School Dist.* v. *Schempp* (1963), 374 U. S. 203, 10 L. Ed. 2d 844, 83 S. Ct. 1560. In *Schempp,* at page 222, the court had stated:

"The test may be stated as follows: What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circum-

scribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.''

In deciding the *Allen* case, the court analogized New York's law to the New Jersey law declared valid in *Everson, supra,* under which New Jersey reimbursed parents for expenses incurred in busing their children to parochial schools. The court stated that, under the rule announced in *Schempp, supra*: ''The statute upheld in *Everson* would be considered a law having 'a secular legislative purpose and a primary effect that neither advances nor inhibits religion.' We reach the same result with respect to the New York law * * * [its] express purpose was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the state. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools. Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fare in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution.'' *Board of Edn.* v. *Allen, supra,* at pages 243 and 244.

The major reason offered by appellants for the unconstitutionality of R. C. 3317.06(H) is that it constitutes a direct grant of public money to religious schools which are permeated by a sectarian religious atmosphere. However, it is uncontroverted that all money appropriated by the state under this legislation goes to the local public school district. That entity then procures the allowable requested items and services, and distributes them to the applying nonpublic schools.

Making the services and materials available to pupils in private schools does benefit the respective sponsoring organizations by relieving them of the enormous aggregate cost for those items. But *Allen* permits that result. In *Walz* v. *Tax Comm.*, *supra*, at page 672, the court looked back on *Allen* and specifically stated that the "supplying of costly teaching materials was not seen either as manifesting a legislative purpose to aid or as having a primary effect of aid contravening the First Amendment. *Board of Education* v. *Allen*, 392 U. S. 236 (1968)."

It is true that the materials and services contemplated by R. C. 3317.06(H) are not the same as the textbooks of *Allen* and the free busing of *Everson*. But it is a distinction without a difference. All are the same in that they possess a negligible religious implication. "Most bus rides have no religious significance." *Board of Edn.* v. *Allen*, *supra*, at page 244; and, "* * * the record contains no suggestion that religious books have been loaned." *Ibid.*, page 245. In the case at bar, the parties have stipulated that: *"None of the services, materials, or programs provided by local public school districts pursuant to R. C. 3317.06 (H) have been provided for use in religious instruction or devotional exercises, and none of said services, materials, or programs provided thereunder are used in, especially suitable for use in, or were selected for use in religious instruction or devotional exercises."* (Emphasis added.)

The materials and services provided by R. C. 3317.06 (H) do not lend themselves to the religious aura of the recipient sectarian schools. Upon the record before us, they enhance only the secular educational process and that process is properly the concern of the state

The decision in *Pierce* v. *Society of Sisters* (1925), 268 U. S. 510, 69 L. Ed. 1070, 45 S. Ct. 571. was premised upon the view that the state's high interest in education for its young would be sufficiently served through reliance upon the secular teaching provided in parochial schools. And as pointed out in *Allen*, at page 247, "* * * if the state must satisfy its interest in secular education through the instrument of private schools, it has a proper

interest in the manner in which those schools perform their secular educational function." See, also, *Cochran* v. *Louisiana State Bd. of Edn.* (1930), 281 U. S. 370, 74 L. Ed. 913, 50 S. Ct. 335.

Determining that the purpose and effect of this legislation is not aimed at establishing, sponsoring or supporting religion does not end the inquiry, however. "We must also be sure that the end result—the effect—is not an excessive government entanglement with religion." *Walz* v. *Tax Comm.*, *supra,* at page 674. In analyzing this issue, the question is "whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Ibid.,* at page 675. The *Walz* court pointed out that, obviously, a direct money subsidy would be an unconstitutional degree of involvement. But just as that was not the case in *Walz* v. *Tax Comm.*, *supra,* it is not the case here. R. C. 3317.06(H) entails, of necessity, a program that brings about some administrative relationships between public education bodies and church sponsored schools, but that fact alone will not automatically work to invalidate it. "The test is inescapably one of degree." *Walz* v. *Tax Comm.*, *supra,* at page 674.

It has long been held that separation of church and state cannot mean the absence of all contact. Beginning with "state" police and fire protection for churches, the theory of allowable contact has expanded with the reimbursement procedures for busing in *Everson, supra,* the allocation procedure for the free books in *Allen* and *Cochran, supra,* and the administrative relationships inherent in the tax exemption of *Walz, supra.*

The contacts in R. C. 3317.06(H) involve a dual approval of applications at the local and state level; a signature of the parent representative on a receipt indicating that none of the services or materials will be used to any extent for religious purposes; the placing of an identifying stamp of ownership on the education equipment by the local public school district; an on the spot periodic inventory of the nonconsumable equipment loaned; and,

finally, the letting of contracts for the speech and hearing therapists, remedial reading teachers and guidance counselors to be provided under the section. To be sure, the contacts here are greater than if no aid were extended at all, but we do not find that degree of "official and continuing surveillance," or an initial excessive degree of "involvement," in this act such as would render it constitutionally objectionable.

In *Allen,* the statute presumes that books authorized for use in public schools will not be of a religious character and thus authorizes the loaning of such books without further inspection. It seems inherent in the *Allen* plan, however, that some governmental authority will initially have to decide which books are in fact religiously oriented, and exclude them from its general list. Insofar as items are first authorized under R. C. 3317.06(H) for use in public schools, the same type of preliminary procedure exists. This section, however, involves the loaning of many types of materials and services other than books, and an additional step is necessary. Some items, while neutral in public school usage, could, by their nature, also be utilized in the furtherance of religious activity if the religious school which receives them chooses to do so As to such items, where any doubt exists, the State Board of Education is empowered to reject applications for them. We do not believe that this additional step represents an excessive entanglement under *Walz.*

It is also true that R. C. 3317.06(H) is implemented, in part, by a periodic on-the-spot inventory check of non-consumable items, but the record does not indicate that such checks are used to reveal illegal religious usages. Rather, they are a means of ascertaining the effects of continual usage on the physical condition of the items.

In our opinion, the degree of contact between church and state permitted by R. C. 3317.06(H) is no more than minimal and is no more involved than the contact which presently exists in the schemes of aid distribution under the *Allen, Everson* and *Walz* cases, *supra.*

We are not unmindful of the recent case of *Lemon* v.

*Kurtzman* (1971), 403 U. S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105. It involved questions as to Pennsylvania and Rhode Island statutes providing state aid to church-related elementary and secondary schools in the form of salary supplements to teachers of secular subjects. Both were struck down as violative of the "Religion Clauses" of the First Amendment to the United States Constitution, having run afoul of the test set down in *Walz*, which we have discussed above.

Appellants have urged that *Lemon, supra,* is highly analogous to the situation presented by the instant case and is, therefore, controlling as to its federal constitutional questions. We disagree.

In *Lemon*, the United States Supreme Court faced a clearly excessive entanglement in the extensive and continual audit and data inspection relationship existing between the respective states and the church-related beneficiaries of the aid to be provided. From the record before us in the instant case, it is evident that there is no such relationship in either the form or effect of the 1967 Ohio plan.

More importantly, the Supreme Court in *Lemon* also found excessive entanglement in the degree of state surveillance necessary to ensure the ideological neutrality of secular teachers employed by the parochial schools. As Chief Justice Burger stated for the majority:

"* * * In terms of potential for involving some aspect or morals in secular subjects, a text book's content is ascertainable, but a teacher's handling of a subject is not. We cannot ignore the dangers that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of precollege education. The conflict of functions inheres in the situation.

"* * * *

"We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with

his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. * * *

"** * *

"** * * To ensure that no trespass occurs, the state has therefore carefully conditioned its aid with pervasive restrictions. An eligible recipient must teach only those courses that are offered in the public schools and use only those texts and materials that are found in the public schools. In addition the teacher must not engage in teaching any course in religion.

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. * * * These prophylactic contacts will involve excessive and enduring entanglement between state and church." *Lemon* v. *Kurtzman* (29 L. Ed. 2d, at 758, 759, 760).

As stated heretofore, Ohio's plan involved auxiliary personnel only, not "teachers of secular subjects." It is difficult for us to perceive how specialized services, attuned to the needs of the physically, emotionally, and culturally handicapped children of this state, could give rise to the same fears of religious bias as might exist in an informal, day-to-day teaching situation.

Additionally, it is uncontroverted here that the auxiliary personnel involved are both *hired* and *paid* by the state of Ohio, through its local public school districts. That fact effectively negates the existence of "religious control and discipline" as an element of the instant case.

On a purely factual basis, therefore, we are compelled to distinguish *Lemon* from the case at bar here. The law which was applied in *Lemon*, however, remains as viable as ever:

"Every analysis in this area must begin with consideration of the cumulative criteria developed by the court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must

be one that neither advances nor inhibits religion, *Board of Education* v. *Allen*, 392 U. S. 236, 243 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz, supra,* at 674." *Lemon* v. *Kurtzman, supra* (29 L. Ed. 2d, at 755).

We have applied those tests to the Ohio plan, as it existed in 1967, and have found it not violative of the Establishment Clause of the First Amendment. As was stated in *Lemon, supra,* at page 758: "* * * Our decisions from *Everson* to *Allen* have permitted the states to provide church-related schools with secular, neutral or non-ideological, services, facilities or materials. * * *"

Appellants contend also that R. C. 3317.06(H) offends the Free Exercise Clause of the First Amendment. However, here, as in *Allen,* " 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion.' *Abington School District* v. *Schempp* (1963), 374 U. S. 203, 233, and appellants have not contended that the [law] in any way coerces them as individuals in the practice of their religion." *Allen* v. *Board of Edn., supra,* at page 248.

The remaining question is whether R. C. 3317.06(H) is repugnant to the Ohio Constitution. In this connection, the sole fact that some private schools receive an indirect benefit from general programs supported at public expense does not mean that such schools have an exclusive right to, or control of, any part of the school funds of this state, within the prohibition of Section 2 of Article VI of the Constitution of Ohio.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., SCHNEIDER, DUNCAN, CORRIGAN, STEPHENSON and LEACH, JJ., concur.

STEPHENSON, J., of the Fourth Appellate District, sitting for STERN, J.