enson A. WOLMAN et al., Plaintiffs,

v.

Martin W. ESSEX et al., Defendants.

Civ. A. No. 71–396.

United States District Court,
S. D. Ohio, E. D.

April 17, 1972.

Joshua J. Kancelbaum, Cleveland, Ohio, M. Willard Dobbs, Columbus, Ohio, Donald M. Robiner, Cleveland, Ohio, for plaintiffs; Stanley K. Laughlin, Jr., American Civil Liberties Union of Ohio, Columbus, Ohio, Melvin L. Wulf, Legal Director, American Civil Liberties Union, New York City, Philip M. Dunson, Sp.Counsel, Americans United for Separation of Church & State and the Ohio Free Schools Assn., Columbus, Ohio, of counsel.

William J. Brown, Atty. Gen., State of Ohio by David J. Young, Sp. Trial Counsel, James J. Hughes, Jr., City Atty. by James R. Kirk, Asst. City Atty., Columbus, Ohio, for defendants.

## OPINION

Before PECK, Circuit Judge, and KINNEARY and RUBIN, District Judges.

CARL B. RUBIN, District Judge.

This matter comes before the Court on plaintiff taxpayers' suit for declaratory and injunctive relief, defendants' motion to dismiss the complaint for failure to state a claim, and the briefs, memoranda, stipulations and exhibits of the parties. A three judge court convened pursuant to 28 U.S.C. §§ 2281–2284 on March 21, 1972, and heard this matter on its merits. The present suit was filed on December 20, 1971, along with a request for a temporary restraining order. The restraining order was granted on March 17, 1972, and continued by the three judge court pending final disposition of the constitutional questions raised by the complaint.

Plaintiffs in their suit ask the Court to declare Section 3317.062 O.R.C. unconstitutional as violative of the Establishment Clause of the First Amendment to the Constitution of the United States, as made applicable to the states through the Fourteenth Amendment, and to enjoin permanently its operation. Plaintiffs' standing to challenge the statute's constitutionality under the doctrine of Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) has not been seriously challenged by the defendants.[1]

## I

## THE STATUTE

Section 3317.062 O.R.C. was passed during the fall of 1971 by the General

---

1. Also see, P.O.A.U. v. Essex, 435 F.2d 627 (6th Cir. 1970), cert. den. Donahey v. P.O.A.U., 403 U.S. 955, 91 S.Ct. 2277, 29 L.Ed.2d 865 (1971).

Assembly of Ohio as a part of Amended Substitute House Bill No. 475. It was signed into law by the Governor on December 20, 1971. Section 3317.062 constitutes a small portion of the legislative enactment that adopted the first statewide income tax law in the history of Ohio and was to become effective on March 20, 1972. While the legislative enactment adopted by Amended Substitute House Bill No. 475 is a broad one, the only constitutional question before this Court arises through the interplay between Section 3317.02(D) and Section 3317.062 O.R.C. Section 3317.01 represents Ohio's general commitment to assist the various school districts located in the State. Section 3317.02 contains the basic calculation formula to which the districts are entitled. Subsection (D) of this section provides in material part that:

> In addition to the payments to school districts pursuant to divisions (A) to (C), inclusive, of this section, there shall be paid periodically as determined by the state board of education to each school district an amount for each pupil attending a chartered nonpublic elementary or high school within the district equal to the amount appropriated for the implementation of section 3317.062 [O.R.C.].

There are two major and distinct aspects to Section 3317.062 O.R.C., and these must be carefully delineated. This section provides that the moneys paid to school districts pursuant to Section 3317.02(D) shall be used both for "educational grants to parents" and "to provide services and materials to pupils attending nonpublic schools within the school district." These latter "materials and services" are specifically enumerated in the statute and consist of the following: guidance; testing and counseling programs; provisions for the deaf, blind, emotionally disturbed, crippled, and physically handicapped children; audio-visual aids; speech and hearing services; remedial reading programs; educational television services; and programs for the improvement of the educational and cultural status of disadvantaged pupils.[2]

In reference to parental grants, the statute states that:

> Programs of educational grants shall be established to reimburse parents of nonpublic school children for a portion of the financial burden experienced by them in providing to their children at reduced cost to taxpayers, educational opportunities equivalent to those available to public school pupils in the district.

These financial grants are payable to parents at the end of each school semester upon the filing with the local school district of "parental applications." Applications, to be eligible for parental financial grants, must contain the following assurances: 1) The parent submitting the application has expended money on the non-public education of his child at cost equal to the reimbursement sought; 2) Such child is properly enrolled at a chartered, non-tax supported school; 3) Such school meets the requirements of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. § 2000d; 4) Such school does not discriminate "in the admission of pupils or hiring of teachers on the basis of race, creed, color or national origin; and 5) The applicant is a resident of Ohio.

The amount of parental financial grants for school years 1971–1972 and 1972–1973 has been fixed by Section 3317.062 at ninety dollars ($90.00) per

---

2. The services and materials aspect of the statutory predecessor to Section 3317.062 was upheld against First Amendment challenge in P.O.A.U. v. Essex, 28 Ohio St.2d 79, 275 N.E.2d 603 (1971) and its constitutional validity is not challenged in the present suit. We are here concerned only with the constitutionality of parental reimbursement grants authorized by the newly revised Section 3317.062 O.R.C.

year per student.[3] However, Section 3317.02(D) specifically provides that the amount to be paid under Section 3317.062 for subsequent years shall be periodically "determined by the State Board of Education." Applications will be made on forms approved by the State Department of Education and processed pursuant to guidelines already adopted by said department.

Moneys for services and materials are appropriated separately under Section 3317.062. Various restrictions are placed on such moneys.[4] No similar guidelines or restrictions limit the parental financial grants. Other than the above-enumerated statutory assurances, no express conditions or restrictions are put on money reimbursable for tuition or other allowable expenses.[5]

## II

## NON-PUBLIC SCHOOLS IN OHIO

The number of pupils attending chartered non-public schools during the 1970–71 school year, and therefore eligible for reimbursement grants under Section 3317.062 O.R.C., totalled 334,420.

Approximately 98% of these students attended denominational non-public schools; approximately 95% attended Catholic schools; the remaining 2% attended private non-sectarian schools. During the same period 2,423,821 students attended the state's public schools. The parents of this large class of students, more than 87% of the total number of students in Ohio, are not eligible for parental grants under Section 3317.-062.

The non-public schools attended by children whose parents are presently entitled to receive reimbursement grants under this legislation are chartered and approved by the State Board of Education. These schools are required by law to provide a secular education equivalent to that provided in the public schools.[6] Teachers of secular courses at non-public schools must be certified by the State Department of Education. In addition, substantially all non-public schools in Ohio have been inspected during the past school year to insure compliance with minimal educational standards established by the State Board of Education.

3. Appropriation 207–508 provides for the expenditure of $28,745,142.00 for school year 1971–1972 and $33,337,400.00 for school year 1972–1973. According to estimates of the State Department of Education, the amount available per non-public school student for these years will total $102.00. Of this sum, $10.00 will be used to supply the services and materials program described in Section 3317.062; $90.00 will be used to reimburse the parents of these students; and $2.00 will be retained by the school district to defray the costs of administering these programs. See, Amended Substitute House Bill No. 475, pp. 182–184; Defendants' Joint Memorandum in Support of Motion to Dismiss, pp. 5–6; Stipulation of Facts, Stipulation 21.

4. The services and materials programs, financed pursuant to the statute, are not to exceed in cost or quality "the similar services, materials and programs provided for pupils in the school districts' public schools." Said programs are to be made available on a non-discriminatory basis. Finally,

No school district shall provide services materials, or programs for use in sectarian religious courses or devotional exercise. No educational materials provided shall be used in, especially suitable for use in, or selected for use in sectarian religious courses or devotional exercises. See, Guidelines For the Implementation of Section 3317.062, II A–D.

5. The guidelines allow reimbursement to the parents of non-public school students for expenditures they have made for textbooks, if the textbooks are approved for the public schools in the district; for laboratory fees and other fees required by State minimum standards; for tuition; for testing fees; and for transportation if various conditions are met. Guidelines, *supra*, III K, 1–5.

6. By law, non-public schools are required to give courses in language arts, geography, history, government, mathematics, natural science, health and physical education, fine arts, foreign languages, industrial arts and home economics.

The Court has been supplied with substantial data pertaining to the Catholic school system in Ohio.[7] No similar data has been supplied concerning remaining Ohio non-public schools. For present purposes, the Court assumes that Ohio private non-sectarian schools partake of a generally secular character. With regard to the remaining sectarian schools, whose students comprise 3% of Ohio's total non-public school enrollment, it has been stipulated that these may or may not be similar in character to the Catholic schools described below.

Stipulations by counsel establish the following: The Catholic school system in the Diocese of Columbus is centrally administered by the Episcopal Vicar for Education and the Diocesan Board of Education by appointment of the Bishop of Columbus. The Board of Education is primarily responsible for formulating educational policies for elementary and secondary schools under its jurisdiction. The responsibilities of the Episcopal Vicar lie in the areas of religious education and special education for the handicapped.

Principals of Columbus Catholic schools are primarily, but not exclusively, members of a religious order within the Catholic Church. Principals share responsibility for the welfare of their schools with parish pastors, whose primary responsibility is to see that effective programs of religious education are maintained. In addition, each inter-parochial high school maintains an Advisory Board comprised of the pastors of the parishes whose students attend the inter-parochial high school, and representative laymen. The immediate direction of the school and its instructional program is, however, delegated to the Principal.

Approximately 40% of the elementary and 38.3% of the high school teachers

in the schools are priests, nuns, or otherwise members of Catholic religious orders. It has been stipulated that Catholic school representatives, if called, would testify that none of these teachers have vowed to obey the Church with reference to what they teach or how they teach it, and that none have vowed to teach religious doctrine in secular courses. In addition, most teachers have discontinued the wearing of distinctive garb while engaged in their teaching.

Catholic schools are generally conducted in buildings and facilities owned or leased by the Bishop of the Columbus Diocese or by an entity representing a religious order. Many of the classrooms, hallways and areas of assembly within such schools are decorated with Christian symbols, such as the crucifix, as well as secular symbols, such as the American flag.[8]

In order to comply with state minimum standards, these schools teach required secular subjects for a period of five hours per day. In these secular classes, pupils are taught courses generally equivalent to those taught in the public schools. No teacher in a Catholic school in the State of Ohio is required by his or her administrator to integrate religious doctrine into secular course work. Textbooks for secular courses are taken from Diocesan Textbook Lists, but, generally speaking, are the same as those used in local public school districts.

An additional thirty to forty minutes per day are generally devoted to religious instruction. At religion classes, pupils are taught the Catholic Church's views on topics of social concern, such as marriage, divorce, sexual morality, family planning, abortion and sterilization. Religious exercises and practices such as prayer and instruction in confession and first communion, are includ-

---

7. The data which has been submitted concerns Catholic schools in the Diocese of Columbus. It has been stipulated, however, that Columbus Catholic schools are fairly representative of Catholic schools throughout the State. See, generally,

Stipulation of Facts, affixed *infra* to this Opinion as Appendix A.

8. According to the stipulations, secular courses are often taught in classrooms containing religious insignia. See, Stipulation of Facts, Stipulation 18(e).

ed during this time. Attendance in religion classes is entirely optional for non-Catholic students, but such students pay the same amount of tuition as those who receive religious instruction.[9]

The philosophy and objectives of the Catholic parochial school are perhaps best summarized in the Administrative Regulations of the Diocese of Columbus, attached to the stipulation herein as Exhibit C. These regulations contain, at page 6120, a "Definition of A Catholic School," which is as follows:

> The Catholic Church has always promoted education. For her own she encourages parents to provide that their children receive training in their faith along with instruction in other studies. The inclusion of religion in the curriculum is the deciding factor in the Church's and Catholic parents' decision to erect schools where the integrity of all subject matter can be maintained in an atmosphere of Christian thought.

There is no claim that non-public denominational schools in Ohio fail to provide quality education, generally equivalent to that provided in the public schools; nor does the Court so find. To the contrary, parochial schools provide a long recognized and valuable secular function in our society. See, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 245–248, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Lemon v. Kurtzman, 403 U.S. 602, 613, 625, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). On the basis of the stipulated evidence before us, however, the Court concludes that non-public sec-

tarian schools in Ohio retain a substantial religious purpose and denominational character as well, and that the grant of state aid to such schools therefore raises substantial questions under the First Amendment to the United States Constitution.

## III

## PRINCIPLES UNDERLYING THE ESTABLISHMENT CLAUSE

### A.

Any analysis must begin with and be ultimately resolved by the plain words of the First Amendment to the Constitution of the United States. This Amendment provides, in total, that:

> *Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;* or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [emphasis supplied]

That the First Amendment has been made applicable to the several states through the Fourteenth Amendment is now beyond question. See, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (dictum); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Everson v. Board of Education, *supra*; People of State of Ill. ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

---

9. The average annual cost to Ohio taxpayers for educating a public school student during the 1970–71 school year was approximately $650.60. The average cost of educating students in the Catholic nonpublic schools in Ohio for the same year was approximately $400.00 per pupil, approximately $700.00 per pupil in Christian non-public schools, approximately $525.00 per pupil in Lutheran non-public schools, and approximately $1,050.00 per pupil in Jewish non-public schools. The Court has not been provided with operational cost figures for students attending private non-parochial schools in Ohio.

It will be noted that the first part of the First Amendment, the so-called "Religion Clauses," contains two distinct concepts: It first provides that Congress shall make no laws "respecting an establishment of religion," (hereinafter referred to as the Establishment Clause); and then provides that Congress shall not prohibit "the free exercise thereof," (hereinafter the Free Exercise Clause). It was observed from an early date that there is an inevitable tension between these two, distinct clauses. See, Cantwell v. Connecticut, *supra*.[10]

The Free Exercise Clause has been read in a more restrictive manner historically than the Establishment Clause. Secular and religious purposes do co-exist in time and place and there are inevitable clashes between the two. When these occur, the secular purpose can, in appropriate circumstances, override the religious without constitutional infirmity. For example, the Court struck down in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), the Mormons' practice of polygamy on the ground that it was violative of secular public policy. The Court did not question the right of Mormons to believe abstractly in the benefits of polygamy. To do so would have constituted a violation of the Free Exercise Clause. But the State, the Court ruled, has the right to regulate conduct generally, including religiously motivated conduct. If a religious sect believed passionately in the benefits flowing from ritualistic murder or human sacrifice, such beliefs if acted upon would not save them from being charged by the secular authorities with murder.

In a like manner the State can require that church property meet secular safety standards (fire escapes) and may insure that parochial schools are certifiable under secular criteria. See, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Neither regulation, nor others of like character, are thought to violate the Free Exercise Clause.

Courts have in a series of cases read a requirement of explicit coercion into Free Exercise cases which has not been read into cases arising under the Establishment Clause. See, Tilton v. Richardson, 403 U.S. 672, 689, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Gillette v. United States, 401 U.S. 437, 461–462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). While there is of necessity some overlap between the two clauses, the case at bar raises only Establishment Clause objections to the Ohio statute. See, School District of Abington Tp., Pa. v. Schempp, *supra*, n. 10, 374 U.S. at 222–223, 83 S.Ct. 1560 (1963); Dewey v. Reynolds Metal Company, 429 F.2d 324, 335 (6th Cir. 1970), cert. den. 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971); P.O.A.U. v. Essex, *supra*, 28 Ohio St.2d at 88, 275 N.E.2d 603.

### B.

The major recent developments in Establishment Clause law really began with Everson v. Board of Education, *supra*. In that case the Court was called upon to rule on the constitutionality of a New Jersey statute which provided reimbursement to parents of money expended for bus transportation on public transportation systems by their children to and

10. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." 310 U.S., at 303–304, 60 S.Ct., at 903. See, also, School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 215–218, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

from schools, including Catholic parochial schools. Of significance equal to the actual decision is the following descriptive summary by Justice Black of the values which found expression in the Establishment Clause:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. *No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.* Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State." [emphasis supplied] 330 U.S. at pp. 15–16, 67 S.Ct. at 511–512.

In applying this test to the facts in *Everson,* the Court concluded in a 5–4 decision that the "wall" had not been breached. While the statute did provide some indirect support to church related institutions, and went to the "verge" of unconstitutionality, the Court concluded that the State's manifest intent was a secular and neutral one, i. e., to insure the safety of students, regardless of the school they attended, in traveling to and from school. 330 U.S., at 16, 67 S.Ct. 504.

Following *Everson,*[11] the Supreme Court in School District of Abington Tp., Pa. v. Schempp, *supra,* struck down regulations requiring Bible readings in public schools as violative of the "neutrality" concept it deemed inherent in the First Amendment. Since "neutrality" is an elusive concept, the following test was set down for its ascertainment.

> The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion: 374 U.S. 203, 222–223, 83 S.Ct. 1560, 1571, 10 L.Ed. 2d 844.

The *Abington* standard was further refined and explicated in Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L. Ed.2d 1000 (1968). Under a New York statute local school boards were required to furnish secular textbooks to all students regardless of where they attended

---

11. Between its decisions in *Everson* (1947) and *Abington* (1963), the Court decided a series of cases under the Establishment Clause which bear only tangentially on the issues presented at bar. See, McCollum v. Board of Education, *supra* (1948) (religious instruction of public school students in public school *held,* invalid); Zorach v. Clauson, *supra* (1952) (religious instruction of public school students under a released time program *held,* valid); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (State's Sunday closing law which served secular purpose *held,* valid); also see, *accord,* Two Guys from Harris-Allentown v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); Braunfeld v. Brown, 366 U.S. 599, 81 S. Ct. 1144, 6 L.Ed.2d 563 (1961); Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 298 (1961) (religious test for public office *held,* invalid); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (non-denominational prayer composed by state officials to be recited each day by public school students *held,* invalid).

school. In a 6–3 decision, the Supreme Court, analogizing the statute in *Allen* to the one upheld by the Court in *Everson*, held that it was essentially neutral. The Court reasoned that since the books were merely lent to the students or their parents, the benefits provided to parochial schools were indirect, as where the state supplies police and fire protection to citizens and buildings generally without regard to their religious affiliation or character.

The Court further observed that religious schools pursue two distinct functions: they provide both religious instruction and secular education. Given the safeguards providing for secular assistance which were written into the statute and the absence of any showing on the record that the book loan program assisted the religious education functions of the parochial schools as well, the Court concluded that the secular purpose of *Abington* had been satisfied.[12] See 392 U.S. at 248, 88 S.Ct. 1923. We note in passing the following prescient observation by dissenting Justice Black:

> It requires no prophet to foresee that on the argument used to support this law others could be upheld providing for state or federal government funds to buy property on which to erect religious school buildings or to erect the buildings themselves, to pay the salaries of the religious school teachers, and finally to have the sectarian religious groups *cease to rely on voluntary contributions of members of their sects while waiting for the Government to pick up all bills for the religious schools. Id.,* at 253, 88 S.Ct. at 1931 [emphasis supplied]

It would appear that in part, at least, to accommodate the fears of an electorate politicized along religious lines, which was expressed by Justices Black and Douglas in their dissenting opinions in *Allen, supra,* the governing Establishment Clause test was reformulated, albeit tentatively, yet again in Walz v. Tax Commission, *supra.* Until *Walz,* the test announced in *Everson* and clarified in *Abington,* consisted of two distinct strands: to withstand Establishment Clause attack, a statute had to be both predominately secular in purpose and neutral in its religious effect. *Walz* added a third elemental requirement: a statute, even if it satisfies the first two requirements of the test, must still fall if its end result, or effect, would lead to "excessive government entanglement with religion." 397 U.S., at 674, 90 S. Ct., at 1414.

In *Walz,* a New York statute granting tax exemptions to church held, as well as general charitable properties (the latter class including non-denominational hospitals, libraries and museums) was upheld in an 8–1 decision against the claim that it violated the First Amendment. In reaching its decision, the Court rested on two basic principles. First, it concluded that the statute's purpose was predominately neutral; that it was designed to foster a large class of community institutions whose functions are beneficial to the general community. Second, focusing on the form of aid given, it concluded that tax exemptions, as compared to affirmative monetary grants, are less likely to engender excessive governmental entanglement with religion. While conceding that some benefit flowed to the churches as a result of property tax exemptions, Chief Justice Burger, for the majority, went on to say:

> Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one

---

12. The case had been decided in the state court on cross motions for summary judgent and there was nothing in the record as to the actual character of the books supplied to the non-public schools. An eminent constitutional law scholar has referred to the majority opinion in *Allen* as a "guarded" and "narrow" one. See Freund, Comment, Public Aid to Parochial Schools, 82 Har.L.R. 1680, 1681 (1969).

calling for official and continuing surveillance leading to an impermissible degree of entanglement. *Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards, but that is not this case.* 397 U.S. pp. 674–675, 90 S.Ct. p. 1414 [emphasis supplied].

Justice Harlan pointed out in a separate concurring opinion that the entanglement doctrine is not concerned only with administrative relationships. The additional danger that this doctrine seeks to avoid is the "risk of politicizing religion" and "political fragmentation on religious lines." 397 U.S. p. 695, 90 S.Ct. 1409. Non-entanglement, Justice Harlan observed, is not necessarily assured when administrative activity by government is neutral; participation of any sort by government in statutory programs affecting religion would entangle it in the emotional currents that the Establishment Clause is designed to avoid. In considering the breadth of danger, Justice Harlan noted that:

> . . . exemptions do not differ from subsidies as an economic matter. Aside from the longstanding tradition behind exemptions there are other differences, however. *Subsidies, unlike exemptions, must be passed on periodically and thus invite more political controversy than exemptions.* Moreover, subsidies or direct aid, as a general rule, are granted on the basis of enumerated and more complicated qualifications and frequently involve the state in administration to a higher degree, though to be sure, this is not necessarily the case. Id., at 699, 90 S.Ct. at 1427 [emphasis supplied].

The questions that were troubling Justice Harlan when he wrote the above quoted lines were presented to the Court in the cases of Lemon v. Kurtzman, 310 F.Supp. 35 (E.D.Pa.1969), rev'd 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and DiCenso v. Robinson (together with Earley v. DiCenso), 316 F. Supp. 112 (D.R.I., 1970), aff'd 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), hereinafter referred to collectively as *Lemon*. *Lemon,* which is the Court's most recent pronouncement on the Establishment Clause, reformulated the *Abington-Walz* test in tripartite terms which must control this Court's disposition of the case at bar. As such it mandates careful analysis.

In *Lemon,* the Court was called upon to construe constitutionality of two state statutes. Rhode Island's 1969 Salary Supplement Act (R.I.Gen.Laws Ann. § 16–51–1 et seq. (Supp.1970)), authorized state education officials to supplement, by up to 15%, the salaries received by teachers at non-public schools whose average per pupil expenditure for secular education fell beneath the generally prevailing state-wide average. The statute rested on a legislative finding that the quality of non-public education in the state was jeopardized because an inadequacy of funds had made it difficult for those schools to raise salaries to a level sufficient to attract competent teachers. Various restrictions were woven into the Act. The supplemental salary of non-public school teachers could not exceed the maximum level prevailing at the State's public schools. To be eligible for the supplement parochial teachers had to agree to teach only secular subjects and to use only those materials used by the public schools. Financial data sufficient to provide the basis for making such a determination had to be submitted by the individual schools to the State Department of Education.

Rhode Island's non-public schools accommodated 25% of the state's total school population; 96% of these students attended Catholic parochial schools. While the benefits of the statute were available to all non-public school teachers, it appears that all 250 teachers who qualified taught at Catholic parochial schools.

Pennsylvania's Non-public Elementary and Secondary Education Act (Pa.Stat. Ann., Tit. 24, §§ 5601–5609 (Supp.

1971))), was similar in some ways to the Rhode Island scheme. It rested on a legislative finding that the State's non-public schools were undergoing a crisis in that they were unable to meet mounting costs. The statute authorized the State's Superintendent of Public Instruction to reimburse the non-public schools for their actual expenditures for teachers' salaries, textbooks and educational materials. Only expenditures for secular services were reimbursable and the non-public schools had to keep accounts for this purpose which were subject to state audit. Other restrictions similar to those that existed in the Rhode Island scheme were also present in the Pennsylvania statute. Students enrolled in non-public schools eligible under the statute comprised 20% of the state's total student population. 96% of these students attended church related schools and the bulk of these attended Catholic parochial schools.

The money to finance the Pennsylvania plan was derived from state taxes on horse racing and cigarettes. Money for the Rhode Island Act also, presumably, was derived from general state revenues. Finally, it appears that both statutes applied to all non-sectarian private schools as well as to church related parochial schools.

At the threshold of its decision in *Lemon* the Court, per Chief Justice Burger, summarized the three main evils "against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement in religious activity' . . ." 403 U.S., at 612, 91 S.Ct., at 2111, citing *Walz, supra,* 397 U.S., at 668, 90 S.Ct. 1409. Then the Court reannounced the "cumulative criteria" for testing Establishment Clause issues that could be gleaned from prior cases:

> *First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion,* Board of Education v. Allen, . . .; *finally, the statute must not foster "an excessive government en-*

*tanglement with religion." Walz, supra,* at 674 [90 S.Ct. at 1414]. *Id.,* 403 U.S. at 612–613, 91 S.Ct. at 2111 [emphasis supplied]

It should be noted that the doctrine of entanglement, which had been tentatively announced and explored, in *Walz, supra,* at 674, 90 S.Ct. 1409; also see, *Id.,* at 695, 698–699, 90 S.Ct. at 1424 (separate opinion of Harlan, J.), has now been formally made a part of a tripartite Establishment Clause test.

In fact, *Lemon* was decided solely on entanglement doctrine grounds. In dealing with the first two prongs of the test, the Court first deferred to the avowed secular legislative purpose and, second, concluded that the primary effect of the enactment was "intended to enhance the quality of the secular education in all schools covered by the compulsory attendance laws." 403 U.S. 613, 91 S.Ct. 2111.

The Court found that both statutes led to excessive operational entanglement between Church and State. In addition, both statutes were deemed to violate one of the underlying premises of the First Amendment: the prevention of "divisive political potential." This is the concept of political entanglement. Whereas ordinarily,

> political debate and division, however vigorous and even partisan, are normal and healthy manifestations of our democratic system of government . . . *political division along religious lines was one of the principal evils against which the First Amendment was intended to protect* . . . The potential divisiveness of such conflict is a threat to the normal political process . . . To have States or communities divide on the issues presented by state aid to parochial schools would tend to confuse and obscure other issues of great urgency . . . [I]n *Walz* we dealt with a status under state tax laws for the benefit of all religious groups. *Here we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmenta-*

*tion and divisiveness on religious lines are thus likely to be intensified.* 403 U.S. pp. 622–623, 91 S.Ct. p. 2116 [emphasis supplied].

The Court concluded that if the kind of aid involved in *Everson* and *Allen* had carried the Court to the "verge" of the constitutionally permissible, then the schemes contained in the Rhode Island and Pennsylvania legislation would, if allowed to survive Establishment Clause attack, carry the Court beyond the constitutional precipice. They would set in motion a "downhill thrust" that in time might tend to obliterate the Religion Clauses of the First Amendment and the very valid and necessary policy functions they serve. In the Court's view, therefore, the Pennsylvania and Rhode Island statutes were unconstitutional.

## IV

### APPLICATION OF ESTABLISHMENT CLAUSE PRINCIPLES TO SECTION 3317.062 O.R.C.

In the Supreme Court decisions of most direct significance to the present case, it has thus been held that state-financed busing (*Everson*), secular textbook grants (*Allen*), government property tax exemptions (*Walz*), and building construction grants to church related institutions of higher education (Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), *infra*, p. 413 n. 18) are permissible under the Establishment Clause, but that teacher salary supplements are not (*Lemon*). We read the cumulative language and authority of these decisions as mandating a holding that the parental reimbursement provisions of Section 3317.062 O.R.C. are violative of the Establishment Clause of the First Amendment.

■ We so hold upon consideration of the three-pronged test announced in *Lemon.* This is a . new and evolving standard, lacking ultimate refinement by successive application to a broad range

of parochial aid schemes. We note, however, that the aspects of this test are in the conjunctive and all must be satisfied if the statute is to withstand constitutional scrutiny.

■ The first aspect of the test requires that a statute express a valid secular purpose. We hold that the parental reimbursement provisions of Section 3317.062 satisfy this requirement. Non-public schools perform, in substantial part, a strictly secular function. They teach a portion of the state's school population those elemental skills necessary for a productive and valuable life. It is nearly tautological that the state has a legitimate concern in requiring minimum standards in all of its schools. See, Pierce v. Society of Sisters, *supra; Lemon, supra,* 403 U.S. at 613, 91 S.Ct. 2105. The Ohio statute was passed with the express purpose of helping non-public schools maintain these standards. As in *Lemon,* we find no basis for disputing the express legislative intent; it must therefore be "accorded appropriate deference." [13] *Id.,* at 613, 91 S.Ct. 2105.

The defendants have vigorously argued that the parent who enrolls his child at a non-public school, at little cost to the general taxpayer, is performing an important public service. Since such schools provide an accredited secular education, they contend, it is of little constitutional significance that they partake of a religious character as well, and parents should not be economically penalized for seeking this "added ingredient." See, Defendants' Joint Memorandum, *supra,* at 32, 52–54; also see, Reply Brief of Defendants, at 7.

■ The simple answer to defendants' argument is that *all* state aid to non-public education results in some indirect economic benefit to the state. If this were the sole and controlling factor of a statute's constitutionality, any direct aid to church related enterprises

---

13. It is the opinion of this Court that the first prong of the *Lemon* test will almost invariably be satisfied in cases of this type and may not truly exist as a distinct, dispositive requirement.

could be justified, and the Establishment Clause would be a hollow shell.[14] See, Goldberg v. Kelly, 397 U.S. 254, 265–266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In addition, this argument totally ignores the second and third aspects of the *Lemon* test, to which we now turn.

The second prong of the *Lemon* test provides that the principal or primary effect of the statute, as opposed to its purpose, must not be one that either advances or inhibits religion. This is really nothing more than a restatement of the principle of neutrality, first discussed in *Everson* and later reformulated in *Abington*. One method of gauging the neutrality of a statute, in terms of the Religion Clauses, is to observe the class to which it is directed and that will be affected by it.

The reimbursement grant aspects of Section 3317.062 are directed only towards the parents of children who attend non-public schools.[15] The limited nature of the class affected by the legislation, and the fact that one religious group so predominates within the class, makes suspect the constitutional validity of the statute. In all the cases in which the Court has upheld legislation attacked on Establishment Clause grounds, the affected class has been substantially broader than the class affected by the Ohio statute. In *Everson*, for example, the statute was construed as providing for transportation reimbursements to the parents of all students, regardless of the school they attended;[16] in *Allen* the statute, on its face, required school boards to supply books to all students, once again regardless of where they attended school. The property tax exemption in *Walz* extended to a huge class of non-profit institutions in which churches of all denominations were included along with libraries, parks, hospitals, museums and the like. A federal statute upheld in *Tilton, supra,* authorized construction grants generally to all "institutions of higher education" but placed certain additional restrictions on the grants given to religiously affiliated schools. In each of these cases religiously affiliated institutions were among a broad class of beneficiaries deriving benefits of a general, broad-based, public policy. These cases are truly analogous to situations in which the state provides police and fire protection generally to all people and property within its jurisdiction, regardless of religious affiliation.[17]

---

14. Justice Rutledge responded to this contention when advanced in *Everson, supra,* in the following fashion:

But whatever may be the philosophy [of parochial schools] or its justification, there is undeniably an admixture of religious with secular teaching in all such institutions. That is the very reason for their being. . . .

Yet this very admixture is what was disestablished when the First Amendment forbade "an establishment of religion." Commingling the religious with the secular teaching does not divest the whole of its religious permeation and emphasis or make them of minor part, if proportion were material. Indeed, on any other view, the constitutional prohibition always could be brought to naught by adding a modicum of the secular. 330 U.S. at 46–47, 67 S.Ct. at 526–527 (Rutledge, J., *dissenting*).

15. See Part II of this Opinion, *supra*, at 403.

16. In actuality, the New Jersey statute in question in *Everson* excluded from its coverage schools operated "for profit in whole or in part." The township regulation adopted pursuant to the statute authorized, in turn, only reimbursements to parents of pupils attending public and Catholic parochial schools. The Court avoided considering this aspect of the statute, noting that nothing in the record indicated that any students were affected by it. See, *Everson, supra*, 330 U.S. at 4, n. 2, 67 S.Ct. 504; but see, *Id.,* at 19–21, 67 S.Ct. at 513 (Jackson, J., *dissenting*).

17. Defendants attempt to analogize the statute at bar to statutes which provide economic aid to R.O.T.C. students or student-veterans, regardless of the school at which they attend. This analogy must fail, for if religious schools indirectly derive benefit from such programs, this benefit is entirely incidental and subordinate to the legitimate secular purposes underlying their enactment—purposes which have nothing whatever to do with

Conversely, the Ohio plan does not even purport to have a general, broad ranging reach but is instead restricted to a relatively small sample of the entire class of Ohio students. As with the Rhode Island and Pennsylvania statutes held unconstitutional in *Lemon, supra,* the class within the ambit of Section 3317.062 is overwhelmingly sectarian in character. A substantial beneficiary of the statute can only be organized religion.

■ However, merely because the class to which the statute is directed is small and sectarian is not grounds for holding it unconstitutional *per se* on neutrality doctrine grounds, but such determination may dictate an additional inquiry. That was precisely the situation before the Court in *Lemon* and, having found the class to be predominately sectarian, the Court went on to consider the statutes in terms of the entanglement doctrine. A review of the cases seems to indicate that "neutrality" and "entanglement" exist in an inverse relationship with each other: where there is little evidence that a statute has a predominately neutral purpose and effect, as where the affected class is small or predominately sectarian, courts have scrutinized the statute to see if it engenders excessive entanglement. See *Lemon, supra.* Conversely, where the indicia of neutrality are high, as in *Walz, supra,* because the affected class is broad and internally pluralistic, the inquiry into entanglement has been less strict.

When looked at in this light Section 3317.062 more resembles the statutes the Court struck down in *Lemon* than it does

the ones it affirmed in *Everson, Allen, Walz* and *Tilton.* The statute's neutrality is therefore cast into doubt and it must be carefully scrutinized in terms of the entanglement doctrine, which we now consider.

The third and final prong of the *Lemon* test requires that a statute not foster an excessive government entanglement with religion. The entanglement doctrine contains several distinct aspects. In the context of "administrative entanglement," it focuses upon the use to which the aid is put, the form in which the aid is provided, to whom it is directed, and the extent to which the state must intervene to ensure that moneys provided are being used for constitutionally permissible secular purposes.

In addition, a second and distinct view of the entanglement doctrine involves "political entanglement" and requires an inquiry into the level and nature of political activity such aid may engender and an analysis of the possible consequences of such political activity fractionalizing the electorate along religious lines.

■ The requirement that the public aid provided parochial schools be used only for secular and neutral purposes has been strictly construed.[18] There are no restrictions on the face of Section 3317.062 O.R.C. or in the guidelines promulgated thereunder to insure that the public moneys provided to parents will not ultimately be used for religious purposes. The only standard contained in the statute itself is the exceedingly nebulous provision that the grants are to reimburse non-public school parents for

---

religion. As Chief Justice Burger noted in *Lemon, supra:*

Our prior holdings do not call for total separation between church and state; total separation is impossible in an absolute sense. Some relationship between government and religious organizations is inevitable . . .

. . . [Nevertheless] lines must be drawn. 403 U.S., at 614, 625, 91 S.Ct. at 2112, 2117 (citations omitted).

See also, *Walz, supra,* 397 U.S. at 674, 90 S.Ct. 1409; P.O.A.U. v. Essex, *supra,*

28 Ohio St.2d at 84, 275 N.E.2d 603; P.O.A.U. v. Essex, *supra,* 435 F.2d at 630.

18. For example, in Tilton v. Richardson, *supra,* a provision of the Higher Education Facilities Act of 1963, 77 Stat. 364, 20 U.S.C. § 711–721, which provided building construction grants to a broad range of institutions of higher education, including church related colleges and universities, was subjected to First Amendment attack. The act provided that, for

the burden of making available to their children "educational opportunities equivalent" to those available in the public schools. Even if a theoretical requirement of neutrality or secularism can be read into this vague concept, the statute fails to provide any mechanism to insure that the implied secular purpose is achieved.

Furthermore, this standard has been interpreted, in the guidelines promulgated under the authority of the statute by the State Department of Education, to allow parents to be reimbursed for expenditures relating to textbooks, laboratory and testing fees, transportation and tuition. It cannot be argued that money paid as tuition to a parochial school is neutral, non-ideological or "atmospherically indifferent on the score of religion." See, Freund, Comment, Public Aid to Parochial Schools, 82 Harv.L.Rev. 1680, 1683 (1969). Tuition forms the major part of a school's general fund and moneys derived from it can be used for

any purpose it deems legitimate. Such funds may be used for the construction of a chapel as well as a gymnasium; for the purchase of religious icons as well as laboratory test tubes. At no time have defendants denied that these funds will benefit the denominational schools.

The Ohio statute contains none of the restrictions that hedged the Rhode Island and Pennsylvania schemes in *Lemon, supra.* Whereas the absence of these restrictions on use tends to decrease the amount of state surveillance that would be required to ensure that the restrictions are honored, it must of necessity tend to increase vastly the possibility that public funds will be used for sectarian, non-secular ends. No such general purpose statute has ever been held valid against Establishment Clause challenge.[19] Whereas bus rides are inherently secular (see, *Everson, supra*) and textbooks are arguably so (see, *Allen, supra*), parochial school teachers are not (see, *Lemon, supra*).[20] Tuition is even less so.

the first twenty years of their useful life, buildings constructed with state funds could not be used for sectarian worship or instruction. After twenty years no restrictions as to use were indicated by the statute. The Court concluded that the statute was, in the main, neutral in its purpose and effect. However, in the absence of any factual showing that state-constructed buildings would indeed have a useful life of only twenty years, the Court struck down this aspect of the Act, noting:

If, at the end of 20 years the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion. 403 U.S., at 683, 91 S.Ct. 2091.

19. In construing the precedents in *Lemon*, the Court noted that the only statutes which had ever been held constitutionally permissible were carefully restricted to secular and neutral uses. In this regard, the Chief Justice wrote:

Our decisions from *Everson* to *Allen* have *permitted the States to provide church-related schools with secular, neutral, or non-ideological services, facilities, or materials.* Bus transportation, school lunches, public health services, and secular textbooks supplied in

common to all students were not thought to offend the Establishment Clause. 403 U.S., at 616–617, 91 S.Ct. at 2113 [emphasis supplied].

Also see, *Tilton, supra*, 403 U.S., at 687–688, 91 S.Ct. 2091, 29 L.Ed.2d 790.

20. The Court in *Lemon* noted:

We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated or advanced by neutrals.

The Court then concluded:

*The Rhode Island Legislature has not, and could not, provide state aid on the basis of a mere assumption that secular teachers under religious discipline can avoid conflicts.* The State must be certain, given the Religious Clauses, that subsidized teachers do not inculcate religion . . . To ensure that no trespass occurs, the State has therefore carefully conditioned its aid with pervasive restrictions. *Id.*, 403 U.S. at

The State does not deny the general applicability of the principles discussed above. It argues vigorously, however, that entanglement is not present in the scheme erected by Section 3317.062 O.R.C. because parents, and not schools, are the recipients of the aid provided. See, Defendants' Memorandum in Support of Motion to Dismiss, at 32, 46. Although this argument possesses some superficial validity, the Court does not find it to be persuasive.

■ It is true that a parental reimbursement program providing for transportation expenses was upheld in *Everson*; and that a similar scheme providing textbooks was allowed in *Allen*. These cases do not, however, establish that a "conduit" device may be used as a means of avoiding the First Amendment. *Everson* and *Allen* were not upheld merely because they provided reimbursement aid to parents and students, but because the aid provided was ideologically neutral and supplied in common to the entire class of students of public and parochial schools alike. Our conclusion that the actual recipient to whom the state aid is provided cannot be controlling as to a statute's constitutionality is further supported by the Court's result in *Tilton*, *supra*. There, direct aid to parochial schools was upheld where the aid was provided generally and its use was restricted to secular functions.[21]

It has been conceded by counsel that were the State of Ohio to pay $90.00 directly to the denominational school, such payment would be a violation of the First Amendment. Payment to the parent for transmittal to the denominational school does not have a cleansing effect and somehow cause the funds to lose their identity as public funds. While the ingenuity of man is apparently limitless, the Court has held with unvarying regularity that one may not do by indirection what is forbidden directly; one may not by form alone contradict the substance of a transaction.

A variant of the indirection principle has been upheld in those cases where certain Southern states, in an attempt to circumvent their constitutional obligation to desegregate public schools, closed them instead and provided monetary grants to parents or students for use at so-called "private" schools. These private schools were, in reality, the resurrected public school, now bereft of direct state financial support. These obvious efforts to avoid constitutional reality, through indirection, were invariably struck down. See, Griffin v. County School Board of Prince Edward County, 377 U.S. 218,. 84 S.Ct. 1226, 2 L.Ed.2d 256 (1964); Lee v. Macon County Board, D.C., 267 F.Supp. 458 (1967), aff'd. sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); Poindexter v. Louisiana Financial Assistance Commission, D.C., 296 F.Supp. 686 (1968), aff'd 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968); also D.C., 275 F.Supp. 833 (1967), aff'd 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Brown v. South Carolina State Bd., 296 F.Supp. 199, aff'd. 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968), and other cases cited in Lemon v. Kurtzman, 403 U.S. 633 n.17, 91 S.Ct. 2105, 29 L.Ed.2d 745 (Douglas, J., concurring). Also see, Swart v. South Burlington Town School District, 122 Vt. 177, 167 A.2d 514, 81 A.L.R.2d 1300 (1961), cert. den. 366 U.S. 925, 81 S.Ct. 1349, 6 L.Ed.2d 384 (1961); Almond v. Day, 197 Va. 419,

618–619, 91 S.Ct. at 2114 [emphasis supplied].

The italicized portions of this passage strongly suggest to this Court that *any* general purpose aid, lacking nonentangling restrictions on use, constitutes an almost per se violation of the Establishment Clause. See, also, Americans United For Separation of Church and State v. Oakey, 339 F.Supp. 545 (D.Vt.1972) (three judge court, *per* Waterman, C. J.)

where the Court referred to this Catch-22-like relationship between the second and third prongs of the *Lemon* test as a Scylla-Charybdis situation.

21. This view is supported by Professor Freund who has observed in this regard that "the sharp dichotomy between pupil benefit and benefit to the school seems to me a chimerical constitutional criteria." *Freund, supra,* at 1682.

89 S.E.2d 851, 857 (1955); and cases collected at Annot., 81 A.L.R.2d 1309 (1961). We concur with the view expressed by a three judge court in Griffin v. State Board of Education, 239 F. Supp. 560, 563 (E.D.Va.1965) wherein it was stated:

> [W]e think the State cannot ignore any plain misuse to which a grant has been or is intended to be put. *Nor do we think weight is to be accorded the fact that the money is paid to the pupil or parent and not to the school, for the pupil or parent is a mere channel* . . These premises of decision have especial significance here because the issue is the right of the State or locality to make, and not the right of the pupils, parents or schools to take, the grants (citation omitted) [emphasis supplied].

See, accord, Poindexter v. Louisiana Financial Assistance Commission, *supra*, 275 F.Supp. at 853.

However ingenuous, however laudable, however structured, the substance and the direction of this section of the Code is simply to transfer public moneys to denominational schools. Its operation concerns itself with a simple relationship among three parties: The State of Ohio, a parent who enrolls a child in a non-public school, and the school itself. At the outset of the transaction, the State of Ohio has a fund of money accumulated by the imposition of a tax upon all of its citizens. The parent has voluntarily undertaken an obligation to pay tuition to a non-public school and the school in return has agreed to educate that child in an atmosphere oriented, if not dominated, by the teachings of a specific religion. At the end of the transaction, the parent has applied for and received reimbursement from the State of Ohio in the sum of $90.00 solely and specifically because he has paid that sum to the denominational school. There is $90.00 less in the public treasury and $90.00 more in that of the denominational school. Since the parents in this scheme serve as mere conduits of public funds, the State retains a responsibility of insuring that the public moneys thus provided and which retain their public character throughout the transaction, are used for constitutionally permissible ends and continue to be so used. See, *Tilton, supra.*

The state cannot claim it does not know what the parents will do with their grants, for the expressed intent of the statute is to "reimburse parents of non-public school children for a portion of the financial burden experienced by them" in sending their children to parochial schools. It does not matter that the parents are subsequently free to use the money received for any purpose. The intent of the statute in providing the reimbursement must speak for itself. See, People ex rel. Parke, Davis & Co. v. Roberts, 171 U.S. 658, 19 S.Ct. 70, 43 L.Ed. 323 (1898) (Harlan, J.); *Poindexter, supra*, 275 F.Supp. at 837.

As Justice Douglas has noted:

> [I]t is the use to which public funds are put [and not to whom they are provided] that is controlling. For the First Amendment does not say that some forms of establishment are allowed; it says that "no law respecting an establishment of religion" shall be made. *What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery.* Abington, *supra*, 374 U.S. at 230, 83 S.Ct., at 1575 (Douglas, J. *concurring*) [22]

We conclude that it is of no constitutional significance that state aid goes in-

---

22. Also see, *Everson, supra,* where Justice Jackson in dissent wrote:

> It is of no importance in this situation whether the beneficiary of this expenditure of tax-raised funds is primarily the parochial school and incidentally the pupil, or whether the aid is directly bestowed on the pupil with indirect benefits to the school . . . . The prohibition against establishment of religion cannot be circumvented by a subsidy, bonus or reimbursement of expense to individuals for receiving religious instruction and indoctrination. 330 U.S., at 24, 67 S.Ct., at 515–516.

directly to denominational schools under Section 3317.062 O.R.C. through the medium of parental grants. Since the potential ultimate effect of the scheme is to aid religious enterprises, the Establishment Clause forbids its implementation regardless of the form adopted in the statute for achieving that purpose.

Section 3317.062 O.R.C. has a final infirmity: it provides aid in the form of direct money grants. As noted earlier, the Supreme Court has been highly suspicious of subsidy programs, as evidenced by the warning in *Lemon* that subsidies tend to foment "[p]olitical fragmentation and divisiveness on religious lines." 403 U.S. at 623, 91 S.Ct. at 2116. See also, *Walz, supra*; P.O.A.U. v. Essex, 28 Ohio St.2d 79, 84, 275 N.E. 2d 603 (1971). Whereas direct money subsidies promote the same general economic result as tax exemptions and construction grants, the risks of political entanglement attendant upon them are far greater. See, *Walz, supra,* 397 U.S. at 690, 90 S.Ct. 1409 (Brennan, J., *concurring*); *Id.*, 397 U.S. at 699, 90 S.Ct. 1409 (separate opinion of Harlan, J.).

A state is more actively involved when it provides a subsidy. Subsidies appear as distinct items in the state's budget; they must be debated as to amount each year by the state legislature and thus "invite more political controversy than exemptions." *Walz, supra*, at 699, 90

S.Ct. at 1427 (separate opinion of Harlan, J.). Conversely, tax exemptions, such as those provided in *Walz*, are passive, relatively fixed, and have a long history of public acceptance. With an exemption the state is not physically transferring some of its assets to a given group; it merely refrains from its right to exact more revenue. Similarly, the construction of a building is a one-time act, with few, if any, "continuing financial", or political "relationships or dependencies." *Tilton, supra*, 403 U.S. at 688, 91 S.Ct. 2091.[23]

The Ohio plan contains the seeds for increased political involvement along religious lines at every level of government, from the local school boards to the General Assembly. This, of course, is the ultimate evil to be protected against by the Religion Clauses.[24] Money under the state statute is being given directly to parents of non-public school children, who are overwhelmingly of one religious sect, in the form of a state subsidy. There is nothing natural or final about the $90.00 figure which is available for this school year. Section 3317.02(D) specifically provides that the amount to be paid under Section 3317.062 for non-enumerated years shall be periodically "determined by the state board of education." The State legislature has the ultimate control of these subsidies because

23. Indeed, none of the, factors that mitigated the danger of entanglement in *Tilton* are present in the Ohio scheme. In *Tilton* aid went directly to church related colleges and universities which were not directly controlled by the Church; under the Ohio statute aid goes to parents of elementary and high school students who attend schools over which the religious orders exercise relatively more control. Again, in *Tilton* the provided aid could only be used to construct non-ideological buildings and no religious symbolism could be incorporated into these; under the Ohio scheme parents are reimbursed for parochial school tuition and other expenses which are not inherently non-ideological and neutral.

24. The First Amendment is two-edged: it protects the political processes from the

intrusion of divisive religious influences; it also prevents the government from interfering with the precincts reserved for religion. See, *Lemon, supra*, 403 U.S. at 623, 91 S.Ct. 2091. As Justice Jackson has observed:

Religious teaching cannot be a private affair when the state seeks to impose regulations which infringe on it indirectly, and a public affair when it comes to taxing citizens of one faith to aid another, or those of no faith at all . . . If the state may aid these religious schools, it may therefore regulate them. Many groups have sought aid from tax funds only to find that it carried political controls with it. See *Everson, supra*, 330 U.S. at 27, 67 S. Ct. at 517 (Jackson, J., *dissenting*).

Section 3317.062 further provides that: "Funds distributed pursuant to this section shall not exceed specific appropriations made therefor by the general assembly . . . " Because a large political base favors aid to sectarian schools, pressures on the legislature in subsequent years for additional funds can be expected to be intense. As several recent commission reports have noted, the costs of education are rising and the problems encountered by sectarian schools in raising sufficient revenues are symptomatic of the problems confronting schools generally. See, generally, Report of the President's Commission on School Finance (McElroy Commission); Report of New York State Commission on School Finance (Fleischman Report).

To uphold this statute would be to introduce the religious issue to the very center of state politics. As the need for additional funds remains, the political issue will be an expansive one—with some religions seeking more money, other religions seeking some money—with the result that the issue will be joined along sharply drawn religious lines. Increasing levels of political intensity revolving about religious issues have been strongly discouraged under *Lemon*, 403 U.S. 622, 91 S.Ct. 2105, and under the general thrust and connate principle of the First Amendment.

As we have noted,[25] the cost of educating students at Catholic parochial schools in Ohio is substantially less than the per student cost of public education. Additionally, the State is relieved from the capital costs involved in providing public school facilities for non-public school students. Under the defendants' theory, approximately 90% of parochial school education is directed to secular subjects. If this Court were to adopt the defendants' argument, there would be no logical or constitutional bar prohibiting the State from reimbursing the parents of non-public school students for up to 90% of their out-of-pocket costs. Even at this level, the costs to the State would be less than those incurred in educating public school students.

■ Yet the principle of the First Amendment is to prohibit the State from providing *any* funds which directly support or sponsor *any* church-related institution. This constitutional policy does not turn on the amount of aid a statute provides in any particular school year. Nor does it matter that the aid goes to some or all religions. As Chief Justice Burger has noted in this regard:

> [T]he state programs before us today represent something of an innovation. We have already noted that *modern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support.* Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop. *Lemon, supra*, 403 U.S., at 624, 91 S.Ct., at 2117 [emphasis supplied].

That Section 3317.062 represents the first stage danger of a constitutional "downhill thrust" is all too apparent. We decline to provide the momentum for its acceleration.

■ The Court of course recognizes that aid to denominational schools is the cynosure of increasing political debate and that further activity is to be expected in this area. These schools perform important secular functions and in many ways contribute to the vitality and pluralistic nature of the state. See, Pierce v. Society of Sisters, *supra*; also see, Americans United, et al. v. Oakey, *supra* (Oakes, J., *concurring*). But denominational schools also exist to serve

25. See, *supra*, n. 9.

the sectarian interests of the religions that have created and sustained them and it is to those sources that these schools must look for their financial sustenance. Chief Justice Burger concludes *Lemon* with this thought:

> Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government. The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement is inevitable, lines must be drawn. 403 U.S. at 625, 91 S.Ct. at 2117.

If individuals, for reasons of personal religious belief, voluntarily undergo a financial handicap, foregoing available public facilities by sending their children to selected schools, the First Amendment stands as a bar to their being reimbursed by the state for their sacrifice. This principle is no less vital if, as a result of such sacrifices, the state achieves cultural diversity or derives economic benefit.

 We have not breached the "wall of separation" by providing safe transportation for all children to all schools. We have neither breached that wall by making available the use of textbooks to all children at all schools, nor by providing tax relief to non-public schools as well as patriotic, cultural and charitable organizations. But when special relief is granted to solely non-public schools,

a breach does in fact occur. Even though the proponents may argue, as they did in *Lemon,* and as they do today, that such effort is only an equalizing one, the response must be that equalization cannot embrace the payment of wages to teachers, or the subsidy of the institution.

The basic purpose of denominational education is to foster and maintain the teachings of a denominational religion. The religious aspect of the curriculum must be the principal and dominant reason for the existence of such schools. We recognize and agree that the non-public schools are in the finest tradition of our respective heritages; that they are a strong moral force; that they provide firm cultural underpinnings to our community and supply outstanding leaders for the preservation of our institutions.

 However much we may approve, however much we may respect, however much we may admire the role of non-public education, we cannot substitute such approval, respect, and admiration for the plain language of the First Amendment of the United States Constitution.[26] Neither any of these reasons nor all of them together alters the plain fact that Section 3317.-062 O.R.C., as it permits reimbursement for tuition, will transfer public funds to religiously oriented private schools. These provisions do, therefore, violate the Establishment Clause of the First Amendment to the United States Constitution and should be permanently enjoined.[27]

---

26. Such a syncretic approach to constitutional interpretation was rejected by Justice Frankfurter when he wrote:

 [A]s judges we are neither Jew nor Gentile, neither Catholic nor agnostic. We owe equal attachment to the Constitution and are equally bound by our judicial obligations whether we derive our citizenship from the earliest or latest immigrants to these shores. As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard.

West Virginia State Board of Education v. Barnette, 319 U.S. 624, 646–647, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (Frankfurter, J., *dissenting*).

27. Although Section 3317.062 contains no express severability clause, it is the opinion of this Court that those aspects of the Section not challenged herein; and which were upheld against constitutional challenge by the Ohio Supreme Court in P.O.A.U. v. Essex, *supra*, are of continuing validity. "The cardinal principle of statutory construction is to save and not to destroy." N.L.R.B. v. Jones & Laugh-

## APPENDIX A

### STIPULATION OF FACTS

#### March 16, 1972

The parties, by and through their counsel, hereby stipulate and agree that the following facts may be considered proven and true at all times pertinent to the within action, provided that each party reserves the right to argue the relevance, materiality, interpretation, and legal consequences of all such facts:

1. (a) Plaintiffs are citizens and taxpayers of the United States and the State of Ohio.

 (b) Plaintiffs are representative parties who will fairly and adequately protect the interests of the class of persons consisting of citizens and taxpayers of the United States and the State of Ohio who object to the expenditure of funds of the State of Ohio to provide parental reimbursement grants to parents of pupils attending nonpublic schools pursuant to § 3317.062 of the Ohio Revised Code.

 (c) The class referred to in 1(b) of these stipulations is so numerous

---

lin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); also see, United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *Tilton, supra,* 403 U.S. at 683–684, 91 S.Ct. 2091. This Court's final order will pay respect to this sound principle of constitutional adjudication.

However, this Court is not able to sever those aspects of parental reimbursement grants which may be constitutionally permissible (textbooks, transportation) from those which are clearly unconstitutional (tuition). There are two reasons for this. First, neither the statute nor its guidelines impose enforceable standards for the apportionment of these funds among the various allowed purposes. Therefore, individual schools have almost complete discretion as to how such grants may be allocated. Second, it is not entirely clear that even those funds which are allocated for the purchase of secular textbooks or transportation are constitutionally valid. Unlike the transportation and textbook grants upheld in *Everson* and *Allen,* the Ohio reimbursement grants are not supplied to all students—to those who go to public as well as non-public schools. See p. 412 of this Opinion; also see, *Lemon, supra,* 403 U.S. at 616–617, 91 S.Ct. 2105; *Tilton, supra,* 403 U.S. at 687, 91 S.Ct. 2091. Since Section 3317.062 supplies even this secular and non-ideological aid because of the recipients' religious status and affiliation, it may be invalid. We intimate no opinion as to the constitutionality of the non-tuition aspects of the Ohio scheme if they were made to conform, in terms of breadth of class, to the statutes upheld in *Everson* and *Allen.*

Nor is this Court able to sever those portions of Section 3317.062, which provide parental reimbursements to parents whose children attend private, non-sectarian schools and are not necessarily unconstitutional, from those that reimburse the parents of parochial school students and are void on Establishment Clause grounds. We cannot imply severability as to this aspect of Section 3317.062. Unless

> . . . it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932); also see, United States v. Jackson, 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

As we have noted above, students attending Ohio's private, non-sectarian schools comprise only 2% of the state's total non-public school population and less than one quarter of 1% of the total student population (See, *supra,* at 5). It is not "evident" to us, within the meaning of the *Champlin* test, that the General Assembly would have enacted an independent scheme to assist only this small class of Ohio students. Therefore the maxim of *de minimis non curat lex* (the law cares not for small things) is applicable. Ohio's private, non-sectarian school students have no rights under a statute which is unconstitutional as applied to 98% of its affected class. See, *Lemon, supra,* 403 U.S. at 610, 625, 91 S.Ct. 2105; also see, Hunter v. Madison Avenue Corporation, 174 F.2d 164, 167 (6th Cir. 1949), cert. den. 338 U.S. 836, 70 S.Ct. 45, 94 L.Ed. 510 (1949); Skinner v. United States Steel Corporation, 233 F.2d 762 (5th Cir. 1956).

that joinder of all members is impracticable.

(d) The claims of the representative plaintiffs are typical of the claims of the class.

2. The defendants are public agencies and public officers as described in P2 of the complaint in the within action, having the duties and authorities therein described.

3. On December 20, 1971, the Governor of Ohio signed into law an Act of the General Assembly of Ohio, Amended Substitute House Bill No. 475. This Act, *inter alia*, enacted § 3317.062 of the Ohio Revised Code which becomes effective on March 20, 1972. The copy of § 3317.062 attached to the complaint filed in this action and marked Exhibit A is true and correct.

4. Amended Substitute House Bill No. 475, *inter alia*, appropriate funds raised by Ohio taxes, including, but not limited to, the Ohio state income tax provided in said enactment, for expenditures to insure stipulated per-pupil dollar amounts for public school pupils and to provide substantially lesser per-pupil amounts for nonpublic parental reimbursement grants and materials and services for nonpublic school pupils.

5. The general guidelines for the implementation of § 3317.02(D) and § 3317.062 are attached hereto as "Stipulation Exhibit A." Such guidelines have been duly adopted by the Department of Education for the State of Ohio and are in force and effect.

6. Applications for parental reimbursement grants to parents of pupils attending grades one to twelve, inclusive in nonpublic schools in the State of Ohio have been filed in accordance with the Act and are being received by public school districts throughout the State of Ohio, including, but not limited to, the City School District of Columbus, Franklin County, Ohio (hereinafter called "Columbus School District").

7. All children in the State of Ohio between the ages of six and eighteen years of age with the exception of those determined to be incapable of profiting from instruction are required to attend a public or nonpublic school which adheres to minimum educational standards prescribed by the State Board of Education or to be instructed at home pursuant to a program satisfying such minimum standards and approved by the State Board of Education.

8. The nonpublic schools attended by children whose parents will receive reimbursement grants under this legislation are chartered and approved by the State Board of Education, and representatives of the State Department of Education, if called, would testify that they provide a quality education in all required secular subjects generally equivalent to that provided for children in the public schools.

9. The nonpublic schools attended by children whose parents will receive reimbursement grants under this legislation are required by law to provide a secular education equivalent to that provided in the public schools in language arts including reading, writing, spelling, oral and written English and literature; geography; the history of the United States and Ohio; national, state, and local government in the United States; mathematics; natural science; health and physical education; the fine arts including music; first aid; safety; fire prevention; industrial arts; home economics; foreign languages; and business practices.

10. In order to insure that nonpublic schools in Ohio comply with minimum educational standards established by the State Board of Education, substantially all such schools were inspected during the past school year by representatives of the State Department of Education.

11. Teachers of secular courses at nonpublic schools attended by children whose parents receive parental grants pursuant to this legislation are certified as to qualification by the State Department of Education.

12. State of Ohio minimum educational standards with which nonpublic schools must comply not only regulate the courses required to be taught and the qualification of teachers, but they also regulate additional matters specified in the minimum standards manuals attached hereto as "Stipulation Exhibit B1–3." Minimum standard requirements described in these stipulations and in the manuals attached hereto preceded the enactment of Amended Substitute House Bill No. 475. If called to the witness stand, State Department of Education representatives would testify that relationships required by minimum educational standards between state and local governments and state and local boards of education with nonpublic schools are not materially affected, enlarged, or expanded by the provisions of Amended Substitute House Bill No. 475.

13. The total number of chartered nonpublic schools in the State of Ohio during the 1970–71 school year was 822. The number of schools categorized by organizations administering them is as follows:

| | |
|---|---|
| Catholic | 711 |
| Private (non-sectarian) | 30 |
| Lutheran | 37 |
| Christian | 12 |
| Seventh-Day Adventist | 19 |
| Jewish | 8 |
| Baptist | 2 |
| Episcopal | 2 |
| Quaker | 1 |

The enrollment of these schools during the 1970–71 school year was:

| | |
|---|---|
| Catholic | 316,883 |
| Private | 6,783 |
| Lutheran | 5,495 |
| Christian | 1,760 |
| Seventh-Day Adventist | 1,541 |
| Jewish | 1,321 |
| Baptist | 356 |
| Episcopal | 179 |
| Quaker | 102 |

The total number of pupils attending chartered nonpublic schools during the 1970–71 school year amounted to 334,420.

14. Nonpublic school officials, if called, would testify that none of the schools attended by children whose parents will receive parental grants under this legislation discriminate in the admission of pupils or hiring of teachers on the basis of race, creed, color, or national origin. Plaintiffs do not challenge the accuracy of such testimony in this litigation. The extent to which teachers in the various church-related nonpublic schools are or are not members of the religious faith which administers the schools varies from school to school.

15. The applications for educational reimbursement grants which are being received by the public school districts throughout the state and by the Columbus School District from parents who seek reimbursement for costs incurred as described in the guidelines attached hereto as Stipulation Exhibit A are approximately in proportion to the number of pupils enrolled in nonpublic schools in the State of Ohio as set forth in P13.

16. Commencing sometime after March 22, 1972, defendants will cause educational reimbursement grants to be paid to parents of pupils attending nonpublic schools within the Columbus School District in order to reimburse those parents for expenses incurred as described in the guidelines attached hereto as Stipulation Exhibit A. Such grants will be paid if parents qualify for the grants under the terms of the Act. Parents receiving these grants will include those whose children

attend Catholic, private, Lutheran, Christian, Jewish, Baptist, Episcopal, and Quaker schools as well as parents who provide in-home accredited education for their children pursuant to regulations of the State Department of Education. It is anticipated that the educational reimbursement grants paid to parents of nonpublic school children will be in proportion to the enrollment at the various nonpublic schools specified in P13.

17. The manner in which the various religious and denominational institutions in the State of Ohio relate to the various church-related grade schools in Ohio varies among different denominations and different school systems.

18. The following facts are true with respect to most of the Catholic schools in the Diocese of Columbus but are not necessarily true in regard to other nonpublic schools including private, Lutheran, Christian, Seventh-Day Adventist, Jewish, Baptist, Episcopal, and Quaker schools. The Columbus Catholic schools are fairly representative of Catholic schools throughout the State of Ohio:

 (a) The administrative and policy-making responsibility for these schools is described in pages 2100 through 2123 of the School Policies and Regulations Manual which is attached hereto as "Stipulation Exhibit C."

 (b) These schools are generally conducted in buildings and facilities owned or leased by the Bishop of the Columbus Diocese or by an entity representing a religious order.

 (c) Most principals of such schools are members of a religious order within the Catholic Church; however, some such principals are members of the laity.

 (d) Approximately 40% of the elementary and 38.3% of the high

school teachers in the schools are priests, nuns, or otherwise members of Catholic religious orders who have taken vows of obedience to the Church. Catholic school representatives, if called, would testify that none of these teachers have vowed to obey the Church with reference to what they teach in school or how they teach it, that these teachers have not vowed to teach religious doctrine in secular courses, and that their vow of obedience does not relate to these matters. Most religious teachers have discontinued the wearing of distinctive garb while engaged in teaching in the schools.

 (e) Many of the classrooms, hallways, and assembly areas within such schools are decorated with a Christian symbol, such as the crucifix, as well as an American flag. Secular courses are often taught in a classroom containing a crucifix.

 (f) All teachers and administrators within the schools are employees of the schools with the exception of auxiliary service personnel under contract with the state or federal government.

 (g) Such schools in order to comply with the state minimum standards teach all of the required subjects during the five hour school day required by such state standards. In addition to this, they expand their school day to five and one-half hours, and the additional one-half hour is usually devoted to religious instruction. Such schools also program various religious functions and exercises, but such are either held during the religious course or the required five hour school day is lengthened to accommodate such outside the required five hour

school day. Such religious exercises and practices include devotional activities, special religious activities on days of significance in the Christian calendar, daily prayer, instruction concerning mass, confession and first communion, and religious vocational instruction if pupils indicate an interest in such. During the religion class, pupils are also taught the Catholic Church's views on topics of social concern such as marriage, divorce, sexual morality, family planning, abortion, and sterilization. Such subjects are discussed at appropriate grade levels and are not programmed for discussion except in religion classes. During the required secular course classes, pupils are taught course content generally equivalent to that taught in such classes in the public schools. Pupils who are not members of the Catholic faith are not required to attend religion classes or to participate in religious exercises or activities.

(h) The pupils in the schools who take religion courses are separately tested and graded on what they have learned in such religion classes. No testing fees are charged for any such tests.

(i) Teachers of secular subjects include members of almost all religious faiths and sects, but in all probability a majority of the teachers are members of the Catholic faith.

(j) Lay teachers are hired by the schools after interviews with the principal of the school and with representatives of the local school board of education.

(k) A team appointed by the Diocesan Board of Education has authority to negotiate the salaries of teachers in the schools.

(l) No teacher in a Catholic school in the State of Ohio is required by the organization administering the school to teach religious doctrine as a part of or to integrate religious doctrine into the required secular courses taught in that school.

19. Generally speaking and with very few exceptions, the secular textbooks used in nonpublic schools attended by pupils whose parents will receive grants under this legislation are the same as the textbooks used in the local public school districts.

20. In response to new financial problems, superintendents of Catholic schools in Ohio in late June and early July 1971 announced a $75 per-pupil tuition increase program. They also announced that schools which had not been charging tuition should establish a minimum tuition of $100 per pupil. Prior to that time, all of the Catholic high schools in the state were charging tuition. The average high school tuition charged was approximately $350 per pupil. Some of the Catholic elementary schools charged substantial tuition; some charged minimal tuition; and some charged none. Those charging no tuition typically charged other fees. All schools with prior existing tuition programs raised their tuition $75 per child. Most schools without tuition instituted a new tuition program of at least $100 per pupil. Most of the other nonpublic schools in Ohio had substantial tuition programs in effect prior to June 28, 1971. Some increased their tuition thereafter; some did not. The local boards of education at some Catholic schools outside the Columbus Diocese refused to follow the tuition increase recommendations and elected to finance their education program by other methods. Parents with children attending schools that do not have a tuition payment program

will not be able to receive tuition reimbursement. However, to the extent that they pay for excess transportation costs, secular textbooks, testing fees, or laboratory fees, they can apply for reimbursement for those expenses. The tuition charge permits enrollment for the total educational program. There is no separate charge to enroll for the religion course. The pupil who takes only the secular courses pays the same tuition as those who take the religion course along with the secular courses.

21. The appropriation of monies for implementation of § 3317.062 of the Ohio Revised Code amounts to approximately $102 for each nonpublic school pupil in the state. Two dollars of this amount will be payable to the local school district for its services in administering the law for the benefit of nonpublic students. The initial division of remaining monies will be such that $90 per pupil will be set aside for the purpose of parental reimbursement grants and $10 per pupil will be set aside for the purpose of enabling the public school district to provide materials and services described in the Act. The guidelines which are attached hereto as Stipulation Exhibit A provide that monies not used for parental reimbursement grants may be used to provide materials and services.

22. The average annual operational cost to the taxpayers for educating a public school pupil during the 1970–71 school year was $650.60. If called to testify, nonpublic school representatives would testify that the average annual operational cost of educating pupils in the Catholic nonpublic schools is approximately $400 per pupil, in Christian nonpublic schools approximately $700 per pupil, in Lutheran nonpublic schools approximately $525 per pupil, and in Jewish nonpublic schools approximately $1,050 per pupil.

23. The parental grant reimbursements provided under this legislation are reimbursements, and no parent is entitled to the grants prior to the expenditures required by the legislation.

24. Representatives of the State Department of Education, if called to testify, would testify that the parents of nonpublic school children in the State of Ohio are providing a public service by arranging for an accredited education of their children in compliance with the Compulsory Education Act at a reduced cost to the taxpayers.

25. Acts of the General Assembly may be presented in this action in the same manner as federal statutory law may be presented to this Court.

26. "Stipulation Exhibit D" attached to these stipulations or filed herewith is a true and accurate copy of the form of application for educational grants promulgated by the Department of Education for the State of Ohio and in use for the purpose of processing applications for such educational grants pursuant to the Act.

WILLIAM J. BROWN
Attorney General for the State of Ohio

By /s/ David J. Young
 David J. Young
 Special Trial Counsel
 Dunbar, Kienzle &
 Murphey
 250 East Broad Street
 Columbus, Ohio 43215
 Telephone No. (614)
 228–4371

On Behalf of State Board, Departments, and Officers

Joined as Defendants
JAMES J. HUGHES, JR.
City Attorney
By /s/ James R. Kirk

James R. Kirk by DJY
Assistant City Attorney
City Attorney's Office
City Hall
Columbus, Ohio 43215

On Behalf of Board of Education of the City School District of Columbus, Ohio

/s/ Willard Dobbs

Willard Dobbs
40 South Third Street
Columbus, Ohio 43215
Telephone No. (614) 221–4121

On Behalf of Plaintiffs