## C. Raymond Swart v. South Burlington Town School District et als

[167 A.2d 514]

November Term, 1960

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed January 3, 1961

*Wilson & Keyser* and *Stephen B. Richardson* for the plaintiff.

*Fayette & Deschenes* and *Webber, Costello & French* for the defendants and intervenors.

**Holden, J.** The immediate concern of this appeal is the expenditure of public funds to meet the charges of tuition for the attendance of students at high schools operated by the Roman Catholic Diocese of Burlington, Vermont. The cause has been well argued and thoughtfully presented, in keeping with the sensitive and solemn issues that confront the Court.

The plaintiff, C. Raymond Swart, started this controversy on his asserted status of a resident taxpayer in the South Burlington Town School District. He has joined the school district, its elected officials and the attorney general of Vermont as parties defendant to obtain a declaratory decree in equity of his rights, and the corresponding powers and duties of the defendants by the provisions of 16 V.S.A. §793.

The South Burlington Town School District does not maintain a public high school. It has transferred the task of furnishing plant, faculty and curricula for the higher education of the youth of the town to schools beyond its control that have been selected by the parents and approved by the state department of education.

The aspects of this enactment of which the plaintiff complains provide:

"(a) Each town district shall maintain a high school or furnish secondary instruction, as hereinafter provided, for its advanced pupils at a high school or academy, to be selected by the parents or guardian of the pupil, within or without the state. The board of school directors may both maintain a high school and furnish secondary instruction elsewhere as herein provided as in the judgment of the board may best serve the interest of the pupils.

"(b) Each town school district shall pay tuition per pupil per school year as billed, but not in excess of $325.00 unless authorized by a vote of the town school district, but in no case shall the tuition exceed the cost per pupil per year for the maintenance of such school for the previous year."

Acting according to the terms and formula specified in the statute the defendant school district and its officers, during the years from 1952 to 1958 authorized and made payments in varying amounts to the Cathedral High School of Burlington. This institution ceased operations at the close of the first semester of the 1958-59 school year. Its land, buildings and equipment are owned by the Roman Catholic Diocese of Burlington. During the time of operation as an educational establishment, it was conducted as a religious denominational high school of the Roman Catholic Faith.

The Rice Memorial High School, located at South Burlington, opened its courses of instruction at the time of the closing of Cathedral High School on January 30, 1959. Like Cathedral, this school is owned by the Diocese of Burlington. In the 1958-59 school year, the defendants caused the sum of $19,687.50 to be expended and paid directly to the Rice Memorial High School, for the attendance of South Burlington students at this high school.

Mount Saint Mary's Academy is located in the city of Burlington. The land, buildings and equipment are owned by The Sisters of Mercy of The Diocese of Burlington. The defendants have paid tuition to this school, in varying amounts, since 1952. The payment for the 1958-1959 school year was $2,025.

The chancellor made detailed findings concerning the specific payments to each of these schools and the corresponding tax payments made by the plaintiff over the same period. It is made to appear that the taxes collected from the plaintiff became a part of the public

school funds of the South Burlington Town School District which were disbursed by the defendant officials to the institutions named. The chancellor specifically found that these disbursements were in payment of tuition and not for scholarships nor as awards of merit.

Mount Saint Mary's Academy and Rice Memorial High School were determined by the chancellor to be religious denominational high schools of the Roman Catholic Faith, controlled and principally supported by the Roman Catholic Church. Instruction in the religion of that denomination is included in the curricula of both institutions, and is a required subject for students of that faith. There is no requirement that students of other denominations attend the instruction in religion although some students in this category have elected to do so.

Each of the schools concerned has furnished the Department of Education for the state of Vermont the information relating to the cost per pupil in compliance with the statute. The state department of education has established no policy or regulation to specify whether tuition payments under the statute are to be made to the parents of the students receiving instruction or to the school which furnishes the courses of study.

The provisions of 16 V.S.A. §799 forbid a town school district to pay tuition of a student receiving advanced instruction except to a high school or academy approved by the state board of education. Cathedral High School, Mount Saint Mary's Academy and Rice Memorial High School have received approval from the state board of education as to scholastic standards and educational facilities.

Despite this approval, the plaintiff protests and seeks to have further payments of tuition to these schools enjoined. At the hearing, some of the parents of children attending Rice Memorial High School petitioned and obtained leave to intervene as parties defendant. The intervenors D'Acuti and Charbonneau are of the Roman Catholic Faith. The plaintiff prevailed in the Court of Chancery for Chittenden County. The defendants and intervenors appeal.

The facts reported by the chancellor are not challenged by any of the appellants. The appeal centers on the declaration of the decree that "payment of tuition by the South Burlington Town School District to sectarian high schools is prohibited by the First and Fourteenth Amendments to the United States Constitution and Article 3, Chapter 1 of the Vermont Constitution."

*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.* Amendment 1 of the Constitution of the United States.

*That all men have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be required by the word of God; and that no man ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of his conscience, nor can any man be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments, or peculia(r) mode of worship; and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner controul the rights of conscience, in the free exercise of religious worship. Nevertheless, every sect or denomination of christians ought to observe the sabbath or Lord's day, and keep up some sort of religious worship, which to them shall seem most agreeable to the revealed will of God.* Article 3rd, Chapter 1, Constitution of Vermont.

The record certified to this Court includes the written opinion of the chancellor which states his analysis of the issues relating to religious liberty and separation of church and state as defined in these provisions of the state and federal constitutions. In this memorandum the court observed that all parties had seemingly agreed, and the chancellor adopted the theory that the constitutional provisions of the paramount law of Vermont and of the United States establish a common protection, with the effect that a violation of one infringes upon the other. Noting that the issue presented in relation to the Vermont Constitution has not been previously.reported in the decisions of this Court, the court below resorted exclusively to the First Amendment and the decisions of the United States Supreme Court. (See *Donoghue* v. *Smith,* 119 Vt. 259, 267, 126 A.2d 93, where decision of the constitutional question was not required.)

There has been no objection to the comparison, nor to the treatment of the problem adopted in the court of chancery. We are

not at liberty to belabor the point against established appellate procedure. *Perkins* v. *Vermont Hydro-Electric Corp.,* 106 Vt. 367, 417, 177 A. 631. But since the objective of these proceedings is to obtain a declaration of constitutional rights and limitations, the variation in historical background and mode of expression in the state and federal provisions is not to be overlooked.

In Vermont, the militant sense of freedom which directed its founders to be the first to write a prohibition against slavery in the establishment of the independent state in 1777, was somewhat reserved in expression of religious liberty. Thus it was that in the original Article III, the declaration "that no man ought, or of right can be compelled to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience" was followed by the limitation "nor can any man who professes the protestant religion, be justly deprived or abridged of any civil right, as a citizen, on account of his religious sentiment * * *." In Chapter II, Plan or Frame of Government, a similar limitation is imposed by the oath prescribed for members of the House of Representatives. Vt. Const. 1777, Ch. I, Articles I, III, Ch. II, Section IX; Slade, Vermont State Papers, 1823, pp. 244, 248, compiled by Act of the General Assembly, of Nov. 15, 1821.

The offensive restriction in the Declaration of Rights (Chapter I) was deleted in the Constitution as revised by the First Council of Censors, adopted in 1786. However, the restrictive oath continued until 1793, after the state was admitted to the Union. Vt. Const. 1786, Ch. I, Art. III, Ch. II, Sec. XII (see Slade, Vermont State Papers, *supra,* pp. 517, 524) ; Vt. Const. 1793, Ch. I, Art. III, Ch. II, §16.

Daniel Chipman offers explanation for the early reservations in discussing the adaptation of the Vermont Constitution from its source in Pennsylvania. He points out that while the framers of our constitution were pleased with the Pennsylvania model in its declaration of the rights of religious liberty and conscience, "* * * they were fearful that this religious liberty would be somewhat larger than the people of New England had been accustomed. And they justly considered that it was necessary to adapt the Constitution to the religious sentiments, habits and customs of the people of the State." Chipman, A Memoir of Thomas Chittenden (1849), p. 84. See also, F. N. Thorpe,

The Federal and State Constitution, Colonial Charters and Other Organic Law, Vol. 6, p. 3779.

"The framers of our Constitution, having, as suggested, founded it on the equal rights of the citizens, and having pretty correct notions of religious liberty, had no idea of authorizing the Legislature to tax the minor sects for the benefit of the standing order, yet they considered that as all classes of the community had a common interest in the support of public worship, as they had in support of the common schools, they ought to contribute in like manner for its support.

"And they authorized the Legislature to pass laws to enforce the observation of the Sabbath, and to tax the people for the support of public worship, trusting that they would do it in such manner as to afford no just ground of complaint * * *." Accordingly, the final clause in Article III, Chapter I was added.

Apparently in response to this provision, the Legislatures, in 1778, 1781 and 1783 proceeded to enact laws to carry this concept into effect. The process culminated in the controversial Ministerial Act of 1783 providing taxing authority "enabling towns and parishes to erect proper houses for public worship, and support ministers of the gospel."

This law was the source of constant discord and resentment among the minority denominations until the legislature divested the towns of all power to support the building of places of worship or to support the clergy. Prior changes in the original act merely aggravated the opposition until "at length the people spoke to the Legislature in a language that could not be misunderstood, * * * we will not permit the Legislature to interfere in any manner with our religious concerns. Thus it has been left to every individual to decide for himself whether he would make contribution for the promotion of these objects." Memoir of Thomas Chittenden, *supra,* pp. 86, 91-92; also Jennings, Memorials of a Century (1869), in the chapter, "Influence of the Early Settlers of Vermont on Freedom of Worship," p. 362.

A more intense and far-reaching conflict was generated by a contemporary and comparable bill that was introduced in the General Assembly of Virginia in 1784. The legislation proposed was entitled "A Bill Establishing a Provision for Teachers of the Christian

Religion" and was designed to enforce tax support for the established church. It failed of enactment and in its defeat it secured the passage of the historic "Bill for Establishing Religious Freedom." The struggle in Virginia and the dominant participation of Jefferson and Madison were translated in the First Amendment of the federal constitution. *Everson* v. *Board of Education,* 330 U. S. 1, 13, 67 S. Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392, and cases there cited. For historical background and text references, see dissenting opinion of Rutledge, J., 330 U. S. commencing at 33.

The correctness of the analogy adopted by the chancellor as to the state and federal guaranties is not essential to our decision. In order for the statute to prevail, it must not exceed the limitations of either. In the domain of religious liberty, the resolute history of the First Amendment seems the more demanding. Following the pattern established below, we search the question from the federal aspect.

■■ The basic concept of religious liberty and the separation of church and state was made applicable to the states with the ratification of the Fourteenth Amendment. *Cantwell* v. *Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352, 1356. On questions arising under these amendments the decisions of the Supreme Court of the United States are controlling upon this Court. *State* v. *Scampini,* 77 Vt. 92, 121, 59 A. 201.

■ In determining the validity of 16 V.S.A. §793, the statute must be tested by its operation and effect rather than by its form. *Near* v. *State of Minnesota,* 283 U.S. 697, 708, 51 S.Ct. 625, 75 L.Ed. 1357; *State* v. *Greaves,* 112 Vt. 222, 226, 22 A.2d 497. Despite the delicate and highly important functions entrusted to local school boards, they must perform within the limits of the Bill of Rights. *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 1637, 147 A.L.R. 674. But the First Amendment must be cautiously applied to the end that the agency of the state is not inadvertently forbidden from extending a public benefit to all its citizens without regard to religious beliefs. *Everson* v. *Board of Education, supra,* 330 U.S. at 16. The mere fact that public funds are expended to an institution operated by a religious enterprise does not establish the fact that the proceeds are used to support the religion

professed by the recipient. *Bradfield* v. *Roberts,* 175 U.S. 291, 298, 20 S.Ct. 121, 44 L.Ed. 168; *Cochran* v. *Louisiana State Board of Education,* 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913, 915; *Everson* v. *Board of Education, supra,* 330 U.S. at 18.

In the Cochran case, the distribution of text books to parochial schools was sustained. In holding there was no encroachment upon the First Amendment, there is a reminder to the effect that none of the books distributed is expected to be adapted to religious instruction.

In the Everson case, a New Jersey statute authorized the local school districts to make rules and contracts for the transportation of children to and from school. The legal controversy was precipitated by action of the Ewing school board when it authorized reimbursement to parents of public transportation expense incurred in attending parochial schools. This effect of the statute was upheld against the challenge of the plaintiff taxpayer that such reimbursement violated the First Amendment. The majority opinion defines the limits of the constitutional guaranty:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the federal government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * * No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the federal government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State * * *'."

The Court measured the transportation statute against these limitations. It declined to strike down the New Jersey enactment "if it is within the State's constitutional power even though it approaches the verge of that power." *Everson* v. *Board of Education, supra,* 330 U.S. at 15-16.

In *State of Illinois ex rel McCollum* v. *Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, 2 A.L.R.2d 1338, the appeal concerned a petition for mandamus which sought to compel the re-

spondents to adopt rules and regulations prohibiting religious instruction in the public schools of Champaign, Illinois. The instruction attacked was conducted by private religious groups of different affiliation during regular school hours but attendance was voluntary. Students who declined the instruction were required to remain elsewhere in the school building.

Counsel for the respondents challenged the limitations stated in the Everson case and requested the Court to repudiate them as *dicta*. In addition, it was urged to overrule or distinguish the prior holding that the "establishment of religion" clause of the First Amendment is applicable to the states by force of Amendment XIV.

The Court rejected both contentions. The operation of the program under the Illinois statute, which granted broad authority for such instruction, was held to be "a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment as we interpreted it in *Everson* v. *Board of Education*, * * *." 333 U.S. at 210.

The reading of the McCollum decision is incomplete without deference to the dissenting opinion of Justice Reed. The thought there expressed exceeds the reach of the majority, but not without limitation. He agreed that governmental entities cannot aid all or any religions or prefer one over the other. "But 'aid' must be understood as a purposeful assistance directly to the church itself or to some religious group or organization doing religious work of such a character that it may be said to be performing ecclesiastical functions." 333 U.S. at 248 (dissenting opinion).

*Zorach* v. *Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, followed the McCollum case to the Supreme Court by way of an appeal from the New York Court of Appeals (303 N. Y. 161, 100 N.E.2d 463). Again the issue presented was "release time" for purposes of religious instruction. It is distinguished from its forerunner in that all costs and facilities for the instruction were borne by the participating religious organizations and the classes were conducted outside the public schools. The provisions of the New York Education Law which permitted the program were held not to be repugnant to the First Amendment.

This is its precept: "There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other." But the Court continued, "Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular instruction to force one or some religion on any person."

The doctrine of these cases narrows our problem to this: Does the payment of tuition to a religious denominational school by a public entity finance religious instruction, to work a fusion of secular and sectarian education?

 16 V.S.A. §793 is the instrument which the legislature has provided to the local school districts for furnishing the educational training required by the Vermont Constitution, Ch. II, §64. The enactment entrusts to the school board the decision of whether secondary education will be provided in schools maintained by the district, or elsewhere. If it is to be furnished outside the facilities of the district, the institution to be selected is the choice of the parents or guardian. *Buttolph* v. *Osborn,* 119 Vt. 116, 120, 119 A.2d 686. Whatever the decision, attendance at least until the age of sixteen at the institution provided is compulsory. 16 V.S.A. §§1126, 1127.

In this instance, the defendant school board has elected to discharge its duty by furnishing secondary education outside the public facilities of the district. For a substantial number of its advanced students, at least, the legal and public duty of the district is undertaken in religious denominational high schools that are an integral part of the Roman Catholic church. The church is the source of their control and the principal source of their support.

 This combination of factors renders the service of the church and its ministry inseparate from its educational function. That this

is a high and dedicated undertaking is not to be questioned, and deserves the respect of all creeds. Yet however worthy the object, the First Amendment commands the State shall not participate.

The Bill of Rights secures to those of the Catholic faith that the State shall not intrude in the affairs of their Church or its institutions. It assures to those of different persuasion that it will not lend assistance to them or those of differing faith in the pursuit of their religious beliefs. Our government is so constituted to the end that the schisms of the churches shall not be visited upon the political establishment. Neither shall the conflicts of the political establishment attend the churches.

Considerations of equity and fairness have exerted a strong appeal to temper the severity of this mandate. The price it demands frequently imposes heavy burdens on the faithful parent. He shares the expense of maintaining the public school system, yet in loyalty to his child and his belief seeks religious training for the child elsewhere. But the same fundamental law which protects the liberty of a parent to reject the public system in the interests of his child's spiritual welfare, enjoins the state from participating in the religious education he has selected. See *Pierce* v. *Society of the Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468.

Equitable considerations, however compelling, cannot override existing constitutional barriers. Legislatures and courts alike cannot deviate from the fundamental law.

We conclude that the defendants, while acting within the literal provisions of the statute, have exceeded the limits of the United States Constitution.

*Decree affirmed.*