# Orland Campbell, Jr. v. Manchester Board of School Directors

[641 A.2d 352]

No. 92-194

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed January 28, 1994

Motion for Reargument Denied March 17, 1994

*Charles S. Martin* and *Edward Wayland,* Law Clerk (On the Brief), of *Martin & Paolini, P.C.,* Barre, for Plaintiff-Appellant.

*Peter S. Cullen* and *John Davis Buckley* of *Theriault & Joslin, P.C.,* Montpelier, for Defendants-Appellees.

**Dooley, J.** Plaintiff Orland Campbell appeals the decision of the Washington Superior Court denying his claim to the right of reimbursement under 16 V.S.A. § 822 for tuition expenses incurred in educating his son at St. Andrews Academy in Delaware. The superior court affirmed the decisions of the Vermont Board of Education (State Board) and the defendant, the Manchester Board of School Directors, that reimbursement is prohibited by the Establishment Clause of the First Amendment to the United States Constitution because of St. Andrews' sectarian character. We reverse.

This is the second time this case has been before this Court. Plaintiff originally attempted to appeal directly from the State Board to this Court. Defendant moved to dismiss arguing that no review of the State Board decision was available. We agreed that no review was available by way of appeal, but concluded that plaintiff could obtain judicial review by certiorari in the superior court. *Campbell v. Manchester Bd. of School Directors,* 152 Vt. 643, 644, 565 A.2d 1318, 1318 (1989). This appeal is from the adverse decision of the superior court.

The Town of Manchester does not maintain a public high school. As a result, it is required to pay the tuition costs of local students to attend "an approved public or independent high school, to be selected by the parents or guardians of the pupil,

within or without the state." 16 V.S.A. § 822(a)(1). The amount of tuition assistance is not to exceed "the average announced tuition of Vermont union high schools for the year of attendance . . . or any higher amount approved by the electorate." *Id.* § 824(c).

In 1985, apparently at the instigation of plaintiff, St. Andrews Academy contacted the Vermont Department of Education for approval to educate Vermont students under the compulsory education statute, 16 V.S.A. § 1121, and for approval to receive tuition payments from towns without a public high school. The Department approved the former request but denied the latter "[b]ecause of constitutional barriers." Because of this decision, St. Andrews appears on a list of approved private schools, published in November 1987 by the Department of Education, with a notation that it is ineligible to receive school district tuition payments.

Plaintiff enrolled his son at St. Andrews Academy and applied for tuition reimbursement from defendant. Defendant sent a "Tuition Eligibility Questionnaire" to St. Andrews, and, on the basis of the response, denied reimbursement "based on its religious affiliation." Pursuant to 16 V.S.A. § 828, plaintiff appealed these decisions to the State Board which, after a hearing before a hearing officer, denied the appeal.

Although there are no obvious factual disputes, there has been only limited fact-finding in this case. Relying on the St. Andrews catalogue and questionnaire responses, the State Board found:

> In this case the materials presented suggest that the St. Andrews academic program is excellent. While it requires bible study, one cannot judge from the catalogue alone the true nature and content of these courses. However, the catalogue cover features a church. The Episcopal insignia is incorporated in the school crest, and of greater relevance here, St. Andrews holds itself out as a sectarian institution. It requires participation in Episcopalian services of its students (allowing only Catholic students to substitute attendance at mass for the on campus Episcopal service). The religious aspects of its program "give focus and meaning to our community and weave together the many unique strands within it." St. Andrews Catalogue p. 21.

The catalogue also states that the purpose of the school is to provide education "of a definitely Christian character." The Headmaster's message at the front of the catalogue states "St. Andrew's is an Episcopal Church School" and amplifies that "[w]hat it does mean is that the School takes the Christian faith seriously."

Based on the facts and the standards applied by the Department of Education[1] and defendant, the State Board found "St. Andrews to be a sectarian school" and affirmed on that basis. On certiorari, the superior court affirmed, although it was concerned that defendant had failed to hold a hearing to make a factual record. The court held that on the record presented tuition reimbursement would be unconstitutional.

Before reaching the merits of this case, we must consider one procedural issue raised by defendant. It argues that the relevant statute, 16 V.S.A. § 828, vests the approval of private schools for tuition reimbursement in the State Board so that no relief from an adverse determination is possible against an individual school board directly. Defendant relies on § 828, which states:

> A school district shall not pay the tuition of a pupil except to a public or private school approved by the state board, nor shall payment of tuition on behalf of a person be denied on account of age. A person who is aggrieved by a decision of a school board relating to eligibility for tuition payments, the amount of tuition payable, or the school he may attend, may appeal to the state board and its decision shall be final.

16 V.S.A. § 828 (1989) (current, amended version at 16 V.S.A. § 828 (Supp. 1993)).

We note that this argument was never addressed by the superior court, and further is inconsistent with defendant's actions prior to the superior court proceeding. See *In re Twenty-Four Vermont Utilities*, 159 Vt. 339, 352, 618 A.2d 1295, 1303 (1992) (failure to raise issue in administrative proceeding precludes judicial review). Defendant made the decision to deny tuition payments based on its own analysis of St. Andrews Academy, and it defended that decision before the State Board. There is

---

[1] The "standards" of the Vermont Department of Education were not part of the record before the Board and are not available to us.

nothing in the record that indicates that the State Board maintains a list of schools approved for tuition reimbursement; indeed, its decision-making process is inconsistent with the presence of such a list.[2] See *id.* at 361, 618 A.2d at 1308 (absent compelling indication of error, statutory constructions by agency responsible for its execution is followed). The Department of Education maintains a list, but it is specifically designated as "not binding on a local school board in the exercise of its authority to determine eligibility for tuition purposes."

■ Irrespective of whether defendant is correct that the tuition approval decision is vested in the State Board, the second sentence clearly sets forth the appeal route, which plaintiff followed. If tuition is to be paid, defendant will pay it. Thus, the court had before it the parties with the direct stake in the outcome. Defendant has suggested no alternative route by which plaintiff could have the serious constitutional issues in this case decided. We conclude that § 828, and the certiorari jurisdiction of the superior court, provide jurisdiction for the superior court's review of the merits of the decision.

■ Because it is related to the substance of this case, we also address the statutory construction issue raised by defendant. Defendant reads § 828 to vest in the State Board, through its power to approve a school, the entire responsibility to determine which schools can be reimbursed consistent with the Establishment Clause. We do not believe that is a proper reading of the section. An independent school is "a school other than a public school, which provides a program of elementary or secondary education, or both." 16 V.S.A. § 11(a)(8). The term "approved independent school" is defined in 16 V.S.A. § 11(a)(20) as an independent school, which is approved under 16 V.S.A. § 166. That section, in turn, makes clear that the approval contemplated relates to approval for attendance purposes[3]—that is,

---

[2] If defendant's position were correct, the State Board's decision would have simply involved looking up St. Andrews Academy on its list and stating what the list said. The State Board's decision never mentions such a list nor suggests that any such list would be definitive. Defendant never argued to the State Board that the State Board had an approval list and should consult it.

[3] Effective June 1990, the Legislature amended 16 V.S.A. § 166 to establish

the school meets curricular and other regulatory standards such that children attending the school meet the statutory school attendance requirement. See 16 V.S.A. §§ 166(b)(5) (loss of approval means students are truant unless they enroll in another qualifying school), 1121 (attendance at school of children of school age required); see also *State v. DeLaBruere*, 154 Vt. 237, 241–42, 577 A.2d 254, 257 (1990) (discussing § 1121). Reading the sections together, as we must, we believe that a "public or independent school approved by the state board," as the phrase appears in § 828, refers to approval under § 166(b).

■ There is nothing in § 166(b) to suggest that the Legislature intended the State Board to review whether a particular school is sectarian. No procedures are set forth in the statutes for such a determination. Although the State Board is given rulemaking power with respect to the approval of independent schools, these rules are to relate to whether a school provides a "minimum course of study," "has the resources required to meet its stated objectives," has qualified faculty, and has physical facilities and special services that are in accord with state and federal law. 16 V.S.A. § 166(b). In fact, the State Board has issued no rules that condition approval on a school being nonsectarian. See Vermont Bd. of Educ., Manual of Rules & Practices §§ 2220–2228 (1992) (independent school approval regulations), *reprinted in* 3 Code of Vt. Rules 22000004 (1992). The State Board also has approved a number of sectarian independent schools pursuant to 16 V.S.A. § 166(b). See Vermont Dep't of Educ., Directory of Approved And Recognized Independent Schools in Vermont (1993).[4] Moreover, the Legislature

---

two alternative methods for private schools, now termed "independent schools," to become authorized to meet the attendance requirement of students. 1989, No. 44, § 1. One method is to become "approved" by meeting certain standards for private schools as evaluated by the State Board. 16 V.S.A. § 166(b). The alternative is to become "recognized" by submitting certain information and assurances to the Commissioner of Education. *Id.* § 166(c). Only approved schools are eligible for tuition reimbursement under § 828. The fact that there is an alternative route to become qualified to accept students does not change our conclusion about the meaning of § 166 and § 828.

[4] For example, Rice Memorial High School, a South Burlington parochial sec-

has specifically set out the powers of the State Board, but has not given it the power to determine whether payment of tuition would offend the Establishment Clause of the First Amendment. See 16 V.S.A. § 164.

In 1961, in *Swart v. South Burlington Town School District*, 122 Vt. 177, 167 A.2d 514, *cert. denied*, 366 U.S. 925 (1961), this Court struck down the practice of public school districts paying tuition to religious schools as a violation of the Establishment Clause. Thus, we held that the school district "while acting within the literal provisions of the statute, ha[d] exceeded the limits of the United States Constitution." *Id.* at 188, 167 A.2d at 521. The Legislature took no action to implement that decision, leaving the school districts in the same position today as they were in 1961. Although the relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school, the districts must determine whether such a payment violates the Establishment Clause. This responsibility rests upon them, and not the State Board, except as a matter of appellate review.

Since we have rejected defendant's procedural argument, we must address plaintiff's substantive claim. For purposes of analysis, we divide the substantive question into two parts: (1) whether in these circumstances tuition reimbursement for a religious educational institution offends the First Amendment of the United States Constitution; and (2) whether St. Andrews Academy is such an institution. Defendant claims that tuition reimbursement for tuition paid to a sectarian school offends the Establishment Clause of the First Amendment, which states that "Congress shall make no law respecting an establishment of religion."[5] This prohibition of the First Amendment applies

---

ondary school for which tuition payments were struck down in *Swart v. South Burlington Town School District*, 122 Vt. 177, 167 A.2d 514, *cert. denied*, 366 U.S. 925 (1961), is approved by the Board pursuant to § 166(b).

The earlier version of the Directory was in evidence in this case before the superior court. We take judicial notice of the current version of this public, and widely available, government document.

[5] Defendant has not made a separate claim under Chapter I, Article 3 of the Vermont Constitution, and we do not reach that question. We note, however, that *Swart* was decided under the First Amendment to the United States Constitution because this Court found that "[i]n the domain of religious

to the states through the Fourteenth Amendment. See *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

As indicated above, we decided this precise question in *Swart*, holding that tuition reimbursement for Roman Catholic high schools was constitutionally impermissible. 122 Vt. at 187–88, 167 A.2d at 520–21. This holding was based on the First Amendment jurisprudence as it then stood. As the briefing reflects, that jurisprudence has evolved greatly since 1961 and in directions unpredictable at that time. Thus, we must examine the difficult constitutional issues anew in light of more recent teachings.

In 1971, in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court of the United States developed a three-part Establishment Clause test which has endured, with some modification and internal disagreement, ever since.[6] To prevail under the *Lemon* test, (1) a challenged statute must "have a secular legislative purpose," (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) it must not "foster 'an excessive government entanglement with reli-

---

liberty, the resolute history of the First Amendment seems the more demanding." *Swart*, 122 Vt. at 184, 167 A.2d at 518; see also *Vermont Educ. Bldgs. Fin. Agency v. Mann*, 127 Vt. 262, 269, 247 A.2d 68, 73 (1968) (in the Establishment Clause area, "the limits of the First Amendment of the Federal Constitution are more restrictive"); cf. *Opinion of the Justices*, 616 A.2d 478, 480 (N.H. 1992) (proposed school choice plan that allows tuition reimbursement for sectarian schools violates provisions of New Hampshire constitution). Of course, as pointed out in the text, these decisions refer to a First Amendment jurisprudence that has evolved markedly since they were issued.

[6] In recent decisions, other tests have emerged as possible successors to or replacements for the *Lemon* test, and commentators have speculated how school choice plans might fare under these alternative analyses. See Comment, *The Constitutional Implications of School Choice*, 1992 Wis. L. Rev. 459, 479–83, 486–87. The United States Supreme Court has recently granted certiorari in a case to examine the continuing vitality of *Lemon*. See *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 62 U.S.L.W. 3368 (U.S. Nov. 30, 1993) (grant of certiorari). Speculation on the future of *Lemon* is the grist of law review articles, not the decisions of courts, which must follow the law as it exists. Moreover, our decision is fully consistent with the doctrinal development that may spur the emergence of a new Establishment Clause regime.

gion.'" *Id.* at 612–13 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)).

Two cases since *Lemon* demonstrate the main considerations in applying the *Lemon* test to the tuition reimbursement scheme before us. For the school district, the most important case is *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973), decided shortly after *Lemon*. *Nyquist* involved three New York programs created to aid private schools: a grant program providing aid for maintenance and repair of school facilities to private schools serving a high concentration of low-income children; a tuition reimbursement program providing limited reimbursement to low-income parents who send their children to private schools; and a tuition tax credit for parents who do not qualify for the tuition reimbursement program because their income is too high. At the time the law was passed, twenty percent of the state's children were being educated in private schools and eighty-five percent of the private schools were church-affiliated.

The Court accepted that the programs had secular purposes in protecting the health and safety of private school students, promoting pluralism and diversity and protecting overburdened public schools from having to educate those then in private schools. It found, however, that the tuition reimbursement program failed the "effect" test because most of the money went to tuition for sectarian institutions. The Court noted that the state could not make direct grants to religious institutions because there was no control to ensure that the aid was "used exclusively for secular, neutral, and nonideological purposes." *Id.* at 780.

The Court also concluded that the result was the same when the funds were channeled through the parents for two reasons. First, there were no restrictions on how the funds were used by the institution:

> The tuition grants here are subject to no [use]... restrictions.... Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-ori-

ented schools. And while the other purposes for that aid—
to perpetuate a pluralistic educational environment and
to protect the fiscal integrity of overburdened public
schools—are certainly unexceptionable, the effect of the
aid is unmistakably to provide desired financial support for
nonpublic, sectarian institutions.

*Id.* at 783 (footnote omitted). Second, the element of choice did
not change the fundamental purpose and effect of the reim-
bursement program. Thus, "[w]hether the grant is labeled a re-
imbursement, a reward, or a subsidy, its substantive impact is
still the same." *Id.* at 786.

Relying on the same analysis, the Court also struck down the
tuition tax credit scheme: "The qualifying parent under either
program receives the same form of encouragement and reward
for sending his children to nonpublic schools." *Id.* at 791. Al-
though it decided the case under the "effects" prong of the
*Lemon* test, the Court raised concerns that the political di-
visiveness of state aid to sectarian education created a form of
political entanglement, calling it a "warning signal" not to be
ignored. *Id.* at 796–98.

In the case before us, plaintiff relies mainly upon *Mueller v.
Allen,* 463 U.S. 388 (1983), in which the Supreme Court upheld a
Minnesota law that gave an income tax deduction for expenses
incurred in providing tuition, textbooks and transportation for
children in public or private schools. In *Mueller,* the Court dis-
tinguished *Nyquist* and relied upon a number of factors in find-
ing no impermissible effect: (1) the tax deduction is one of many
in the Minnesota tax code to equalize tax burdens of citizens; (2)
the deduction is available for parents of all children in school,
including those in public schools; and (3) the aid is channeled
through parents so that the benefit is the result of private
choice. *Id.* at 396–99. Although the third of these factors was
also present in *Nyquist,* the Court put greater emphasis on it in
*Mueller*: "The historic purposes of the Clause simply do not
encompass the sort of attenuated financial benefit, ultimately
controlled by the private choices of individual parents, that
eventually flows to parochial schools from the neutrally avail-
able tax benefit at issue in this case." *Id.* at 400. The Court
refused to consider empirical evidence that most of the benefit

went to the parents of children in parochial school. *Id.* at 400–01.

The Court also considered the "entanglement" part of the *Lemon* test because the deduction excluded expenditures on religious textbooks. It held that such determinations did not foster an excessive entanglement. *Id.* at 403.

The themes of *Mueller* are relied upon in *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 489 (1986), in which the Court held that the Establishment Clause does not prevent the provision of vocational rehabilitation services to aid a blind student to pursue studies at a Christian college to become a pastor. Noting that "[i]t is well settled that the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution," the Court emphasized that the aid is given to the student "who transmits it to the educational institution of his or her choice" and it is given on behalf of public and private schools. *Id.* at 486, 487. The Court also emphasized that there was no incentive to use the aid at a religious institution, and no significant part of the aid would end up flowing to religious education. *Id.* at 488. Because of these facts, the Court held that the program did not "confer any message of state endorsement of religion" and upheld aid to the student even though the religious institution could use the assistance provided through the student for any purpose. *Id.* at 489.

If *Mueller* and *Witters* are the controlling precedents, there may be no Establishment Clause barrier to reimbursing plaintiff for tuition paid to a private school. If *Nyquist* is the controlling precedent, there may be a barrier.

Because of the nature of this proceeding, we have only a very limited record on which to make our determination. This is unfortunate because it is difficult to judge the effect of a particular course of action without a clear understanding of the choices available to parents and children, the usage of private schools, the usage of sectarian schools, the number of students who have a choice of school, and the like. Our discomfort is heightened because the specific case before us may be atypical, involving an out-of-state preparatory school that draws students of different religions. We note, however, that *Witters* arose in a similar context and had a similarly sparse record.

We emphasize six "facts" from the record, the statutory scheme and generally available information of which we take judicial notice.[7] First, plaintiff has already paid the tuition in question and is looking for reimbursement; thus, no payment will go directly to a sectarian school. Defendant has made no objection to this procedure although the relevant statute appears to contemplate payment directly to the private high school selected by the parent of the pupil. See 16 V.S.A. § 822(a)(1). Recognizing that direct payments to a sectarian institution may raise additional considerations, we do not address the validity of a direct payment to a sectarian institution.

Second, defendant does not maintain a high school and pays tuition for *all* high school pupils, as required by statute. This is not a case in which a school district both maintains an appropriate school and allows some students to go elsewhere by paying tuition for them. See *id.*

Third, there is no allegation that defendant's decision not to maintain a high school represents a desire to aid sectarian education. Although there are no facts in the record to determine the exact extent of the practice of paying tuition rather than maintaining a high school, the information available to us indicates that a majority of towns maintain a high school, participate in a union high school or designate a private high school as the public high school under 16 V.S.A. § 827(a). See 1993–94 Vermont Year Book 43–44, 46–47 (1993) (listing Vermont secondary schools and composition of union high school districts).[8] From the state perspective, the main evidence that the tuition reimbursement system is not intended to aid religious education is its history. If aiding religious education was the intent of

---

[7] The Court in *Nyquist* took judicial notice of enrollment data from publicly available government reports, exactly the type of information we have used here. See *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 768 n.23 (1973).

[8] An examination of the various districts indicates that roughly half of Vermont's 246 organized towns and cities, see 24 V.S.A. §§ 2–15 (listing Vermont towns and cities by county), are members of a unified district providing secondary education. Approximately forty more, which include most of Vermont's most populous towns and cities, operate their own secondary schools. It is clear that the percentage of students residing in towns that do not provide a secondary school is much lower than the percentage of towns that do provide a secondary school.

the reimbursement system originally, that intent did not survive *Swart* in 1961. Instead, the system has continued for the past thirty years with the only change being the resulting limitation on parental choice.

Fourth, unlike *Nyquist*, there is no indication that the result of defendant's policy will be to send any substantial number of children to sectarian schools. In the 1992–1993 school year, approximately 42,300 students were enrolled in Vermont secondary schools. Vermont Dep't of Educ., Elementary/Secondary Public School Enrollment, 1992–93 School Year (1993) (pages unnumbered). Of that number, approximately 3000, or seven percent, are enrolled in private schools. *Id.* There is a private secondary school in Manchester, Burr & Burton Seminary, which despite its name is listed by the Vermont Department of Education as a nonsectarian school. There is no approved private sectarian secondary school in Bennington County. See Vermont Dep't of Educ., Directory of Approved and Recognized Independent Schools in Vermont (Jan. 1993). We have no indication, however, of the extent to which tuition might be paid for out-of-state schools.

Fifth, the extent of state regulation, or other involvement with, St. Andrews Academy will not be affected by the outcome of this case. The school is already an "approved" independent school. See 16 V.S.A. § 166(b). Apparently, this designation was made because St. Andrews is "accredited or approved by the host state or by an accrediting agency recognized by the State Board." Vermont Bd. of Educ., Manual of Rules & Practices § 2224.3 (Jan. 1992) *reprinted in* 3 Code of Vt. Rules 22000004, at 3 (1992).

Sixth, in this case, the subsidy scheme does not operate to promote sectarian education. The school district of the student's residence must reimburse for the full tuition charged by a public school. For a private school, reimbursement is only at the "average announced tuition of Vermont union high schools for the year of attendance" unless the school meets Vermont public school approval standards or the paying district votes a higher rate. 16 V.S.A. § 824(b)-(c). There is no indication of a higher rate here, and St. Andrews Academy, because it is not a Vermont institution, cannot meet Vermont public approval standards. See *id.* § 11(a)(8).

■ Turning to the merits, we can dispose quickly of the first part of the *Lemon* test. There is no question that the purpose of the statutory scheme is to provide educational opportunity for school-age children while offering educational choice. As indicated above, there is no indication of a purpose to aid sectarian education. There is clearly a valid secular purpose for the tuition reimbursement scheme.

■ On the second part of the test, we find this case to be governed by *Mueller* and *Witters* and not by *Nyquist*. Thus, we find that the primary effect of the tuition reimbursement scheme is not to advance religion.

There are a number of critical distinctions between this case and *Nyquist*. Here, tuition reimbursement covers all students whether or not they attend a public or private school, whereas in *Nyquist* it went only to private school students. As *Mueller* states, "a program . . . that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause." 463 U.S. at 398–99.

In *Nyquist*, the purpose of the law was to aid private schools, the majority of which were religious schools. 413 U.S. at 783. The Court assumed the purpose would be realized so that "the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* Here, there is no indication that aid to sectarian education is either a purpose or a main effect. No doubt some tuition support will go to religious institutions because of our decision. The state and the town are entirely neutral on the extent to which parents exercise that option in the context of reimbursement of tuition payments to parents.

If anything, this case shows a preference for public education because, as discussed earlier, plaintiff faces unreimbursed costs in sending his son to an out-of-state independent school. We note, however, that this may not be true for all private schools because the attainment of Vermont public school approval standards allows for full reimbursement, and the cost may be above that for public schools which, of course, meet the same standard.[9] In this case, as in *Witters*, the tuition reimbursement

---

[9] Another reason why reimbursement above the average public school tuition is not possible in this case is that the authorization for such reimbursement became effective in 1991, well after the actions in issue here. See 1991, No. 24, §§ 1, 3. We have noted this change in the law to be clear that we have not

scheme involved here "creates no financial incentive for students to undertake sectarian education." 474 U.S. at 488. We leave for another day consideration of a case in which the reimbursement scheme might favor sectarian education.

If there is a difference between *Nyquist* and the later *Mueller* and *Witters* decisions, it lies in the weight to be given the intervention of parental choice. *Nyquist* considered this "only one among many factors to be considered," 413 U.S. at 781, but held that aid was prohibited whether labeled "a reimbursement, a reward, or a subsidy." *Id.* at 786. By the time of *Mueller*, the Court was willing to say that an "attenuated financial benefit, ultimately controlled by the private choices of individual parents" is not encompassed within the historic purposes of the Establishment Clause. 463 U.S. at 400. *Witters* stressed that any financial benefit to religious institutions was the "result of the genuinely independent and private choices of aid recipients." 474 U.S. at 487.

Any aid flowing to religious schools from this decision is also the result of a parent's genuinely independent and private choice. To the extent this factor has become more significant in the application of the *Lemon* test, it supports a conclusion that there is no Establishment Clause violation in this case.

The only real distinction between this case and *Mueller* is that we are dealing with a payment rather than a tax deduction. We agree that the benefits in *Mueller* are more "attenuated," but we cannot conclude that this consideration alone is determinative. Indeed, *Nyquist* equated tax credits with tuition reimbursements, finding the same economic effect. There is no critical difference between the tax credits in *Nyquist* and the deductions in *Mueller*. See *Luthens v. Bair*, 788 F. Supp. 1032, 1039 (S.D. Iowa 1992). Whatever the device, the benefit here to sectarian education is indirect and the effect of parent choice, not government endorsement.

■ Finally, we must consider the third part of the *Lemon* test. Ordinarily, this part is easily met in a parental choice system because the state has no involvement in the operation of the school selected by the parent.[10] That is the case here because

---

decided whether reimbursement under the 1991 scheme is consistent with the Establishment Clause.

[10] We do not believe that the third part of the *Lemon* test should be judged by the political divisiveness concern of *Nyquist*. That concern is "confined to

St. Andrews Academy is already approved to accept students, and tuition reimbursement will involve no greater governmental regulation or involvement. As a non-Vermont school, St. Andrews cannot come into compliance with public school approval standards, with more detailed regulation by the state, in order to allow for full tuition reimbursement. See 16 V.S.A. § 11(a)(8).

We do not imply, however, that tuition reimbursement avoids excessive entanglement in all contexts or even in general. Vermont has significantly modified its laws with respect to independent schools to avoid excessive entanglement with religion in the regulatory process and protect the free exercise of religion. See *DeLaBruere*, 154 Vt. at 241–44, 577 A.2d at 257–59; Note, *State Regulation of Private Church Schools: An Examination of Vermont's Act 151*, 8 Vt. L. Rev. 75 (1983). To allow students to accept tuition reimbursement, religious schools will have to go through the approval process that will increase governmental regulation. Even more governmental regulation is the price for full tuition reimbursement under the current law. We have not determined when government regulation of religious schools may cross the line and invalidate a tuition reimbursement system.

Based on the three parts of the *Lemon* test, we conclude that reimbursement of tuition to plaintiff would not offend the Establishment Clause even if St. Andrews Academy is a sectarian institution. Accordingly, we do not reach the issue of whether the superior court's determination that St. Andrews is sectarian was in error.

In conclusion, we emphasize the narrowness of our decision based on the narrow record before us. As in *Witters*, we decide only that giving tuition reimbursement to this plaintiff will not offend the Establishment Clause. See 474 U.S. at 489–90. In other cases, with a fuller record or different circumstances, the result may well be different.

*Reversed; cause remanded to determine the amount of tuition reimbursement to which plaintiff is entitled.*

---

cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools." *Mueller v. Allen*, 463 U.S. 388, 404 n.11 (1983). No such direct subsidy exists in this case.